Richard Scott VAN CLEVE, Appellant,

v.

STATE of Alaska, Appellee.

No. 5500.

Court of Appeals of Alaska.

Sept. 3, 1982.

Christine Schleuss, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

Peter A. Michalski, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C. J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Richard Van Cleve was tried and convicted in the superior court in Anchorage of second degree murder,[1] and was sentenced to twenty years' imprisonment. He appeals his conviction and sentence to this court alleging two claims of error: first, that the superior court erred in denying his pretrial motion to suppress a confession which he made to the police, and second, that the sentence is excessive.

On November 2, 1979, Van Cleve accompanied Gary Hile and Billy Williams, two friends, to watch Allen Butcher, another friend, play hockey. Van Cleve consumed two quarts of malt liquor during the game, at least one beer on the way to Hile's home after the game, and several rum-and-cokes while at Hile's home. At some point prior to 2:30 a. m. Van Cleve quit drinking and went to sleep, only to be later awakened by Butcher who wanted to go downtown.

At about 2:30 a. m., all four individuals left the house. They first dropped Williams off, then proceeded to drive around downtown Anchorage in Hile's car. At about 4:30 a. m. they returned to Hile's home. At that time Van Cleve and Butcher got into Van Cleve's car and returned downtown. While driving around, Van Cleve and Butcher generally caused trouble. They yelled at Eskimo natives, hassled prostitutes, attempted to strike a native male who was walking in the area, and indiscriminately assaulted people with a hockey stick.

At approximately 5:30 a. m., Van Cleve was stopped by Anchorage Police Officer Bill F. Reeder after Reeder observed him carrying a hockey stick and walking in the direction of a native male. At that time Reeder noticed a slight odor of alcohol about Van Cleve, but did not think he was intoxicated. Knowing that Van Cleve was driving, Reeder told him to go home.

On the way home, Butcher pointed out to Van Cleve the same man Van Cleve had intended to hit with the hockey stick before being stopped by Reeder. Van Cleve exited the car with his stick and followed the man, later identified as Mike Hiratsuka, around the corner. He returned to the car about two minutes later with his hands covered with blood. Just before reaching the car he threw his hockey stick on top of a nearby warehouse.

Van Cleve then drove Butcher home, went inside Butcher's home to clean up, and then drove himself home. It was then about 5:30–6:00 a. m.

---

1. Former AS 11.15.030.

At approximately 6:30 a. m., Van Cleve was arrested at his home after Reeder learned that Hiratsuka had been beaten. At that time Reeder read Van Cleve the *Miranda* warning from a card and then had him transported to the police station where he was again advised of his rights, this time in writing. Van Cleve acknowledged that he understood his rights and signed a waiver of rights form after being asked to read and initial each right on the form and to sign the form only if he understood it.

At exactly 8:37 a. m., Reeder began a recorded interview with Van Cleve whereupon he confessed to having beaten the native male with a hockey stick.[2] The interview lasted eight minutes.

Following the interview, the officers took Van Cleve and Butcher to the scene of the incident. Van Cleve showed Reeder where and how things took place and pointed out the area where the hockey stick was located. Van Cleve was subsequently charged with second degree murder.

A pretrial suppression hearing was held to determine the admissibility of Van Cleve's confession. Conflicting facts surrounding the voluntariness of that confession were presented at the hearing. Officer Reeder testified that at all times that he was in Van Cleve's presence, i.e., during the arrest and interview processes, Van Cleve appeared to be functioning in a normal manner. Despite a slight odor of alcohol about him, he did not conduct himself in a manner that suggested that he was intoxicated.[3] Reeder's testimony was corroborated by a second police officer present during the interview, Officer Larry Arend, who testified that when he observed Van Cleve he was "[q]uiet, but when asked questions by Officer Reeder, they were very

2. Van Cleve's confession basically revealed that the attack was unprovoked, that it was indiscriminately based on the victim's ethnicity, and that it was committed in a barbaric and cruel manner. Pertinent parts of that interview read as follows:

> REEDER: [Anchorage police] officers found a native male that had been assaulted with a hockey stick. Go ahead and tell me basically what happened from the time I talked to you there at Fourth and Barrow to the time of the assault. Who were you with and. . . .
> VAN CLEVE: Yea it was Allen Butcher in my car and ahh we just saw this native and ahh I don't know decided to take; I, I don't know, decided to take it, the stuff, out on him, I guess.
> REEDER: Okay, why; why were you mad at the native guy in particular?
> VAN CLEVE: Cause of the Natives there on Fourth Avenue when he drove by there before there's a bunch of, a group of them, they ah, made a bunch of, ah gestures we didn't like too much.
> REEDER: Okay, can you be more specific exactly, I think I know what your talking about.
> VAN CLEVE: Then they went up to our car and stuff and ahh you know like smart asses.
> REEDER: Okay, do you recall anything specific they said, did they use obscenities or profanity or. . .?
> VAN CLEVE: No, not really uhuh (negative).
> REEDER: Okay, just giving you a hard time uhh?
> VAN CLEVE: Yea.
> 
> \* \* \* \* \* \*
> 
> REEDER: Where did you see this native at?

> VAN CLEVE: A couple ahh threw a couple of rocks at my car.
> 
> \* \* \* \* \* \*
> 
> REEDER: Did ahh who got out and assaulted the. . .
> VAN CLEVE: I did.
> REEDER: Okay, what did you use?
> VAN CLEVE: Hockey stick.
> 
> \* \* \* \* \* \*
> 
> REEDER: Alright, what what was your intention when you saw him and you got out, were you just going to knock him down or. . .
> VAN CLEVE: Yea.
> REEDER: Or beat him up pretty bad or. . .
> VAN CLEVE: I didn't mean to beat him up that bad.
> REEDER: Okay, do you recall how many times you hit him?
> VAN CLEVE: Not really.
> REEDER: Was it more than two or three?
> VAN CLEVE: Yea, more than two or three.
> REEDER: You said you got carried away, did he do something to make you angry?
> VAN CLEVE: No, not really.
> REEDER: Did he say anything at all to you?
> VAN CLEVE: No.

3. Reeder also testified that when he stopped Van Cleve on the street one-hour earlier, the only thing that indicated that Van Cleve might have been intoxicated was a slight odor of alcohol about him. However, Reeder stated that because it was such a mild odor and because Van Cleve showed no signs of unsure balance or other signs of intoxication, Reeder permitted him to drive home.

cooperative, very rational type answers." He also stated that Van Cleve did not appear to be intoxicated, carried himself well, and was able to walk without "a staggering gait ... or anything of this nature."

Van Cleve's version of the circumstances surrounding his confession differed substantially. Van Cleve testified that even though he signed the rights waiver form prior to his statement to the police, the combination of fatigue, intoxication, and pressure from the incident kept him from comprehending what he was either signing or doing. In support of Van Cleve's testimony, Van Cleve's mother testified that when she went to awaken Van Cleve on the morning of his arrest, he smelled like a "bar room," and that once awakened, he did not appear to be in his "alert normal condition." She further stated that this condition continued for about two weeks thereafter.

After hearing all the evidence, the superior court denied Van Cleve's motion to suppress, finding the following facts: that Van Cleve knew what charge the police suspected him of committing; that his description of what he did coincided with the objective facts found by the police; that he was sufficiently mature and intelligent that he was not "overly suggestible in the presence of authority"; that he was not too intoxicated so as to render him unable to function well; and finally, that there was "nothing in his manner of function that would indicate that—that he was so overborne by this process that he could not have given the knowing and voluntary consent to the 5th amendment and 4th amendment waivers that were obtained from him."

Following trials, the jury returned a verdict of guilty, and the court sentenced Van Cleve to twenty years imprisonment. With these facts in mind, we now review Van Cleve's contentions.

## DENIAL OF MOTION TO SUPPRESS

Van Cleve claims that the superior court erred in denying his pretrial motion to suppress the confession and thus that constitutional due process was violated by the use of that evidence against him at trial. Van Cleve does not dispute that he was advised of his rights prior to interrogation, nor does he dispute that an accused may waive fifth amendment rights "provided the waiver is made voluntarily, knowingly and intelligently".[4] He contends that he did not effectively waive his *Miranda* rights. He points to the totality of the circumstances,[5] including his youth and immaturity, inexperience with the law, state of shock caused by the incident itself, state of intoxication, and the "coercive" details of the interrogation, to support his contention that these factors, when viewed in the entirety, demonstrate that the state has failed to prove a knowing, intelligent, and voluntary waiver. Conversely, the state argues that the record supports the decision that the confession was voluntarily made.

We stated in *Johnson v. State*, 631 P.2d 508, 510–11 (Alaska App. 1981) that:

Judicial determination of the voluntariness of confessions involves a unique process. This process has been described as requiring the trial court to apply a three-phased analysis. The court first determines what happened—whether a confession was made and what the basic circumstances surrounding it were. Next the court must decide by means of inference what the effect of the factual circumstances upon the mental state of the accused actually was. And, finally, from its decision as to the accused's state of mind the court must draw its ultimate conclusion as to the voluntariness, in a legal sense, of his confession. [Footnotes and citations omitted.]

 The scope of our review as to the voluntariness of a confession is twofold.

**4.** *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 707 (1966).

**5.** We examine the "totality of the circumstances" to determine whether a confession was voluntarily and knowingly made. *S. B. v.*

*State*, 614 P.2d 786, 788 (Alaska 1980); *Stobaugh v. State*, 614 P.2d 767, 771 (Alaska 1980); *Quick v. State*, 599 P.2d 712, 718 (Alaska 1979).

**976**

The trial court's findings of fact will be reversed only if clearly erroneous.[6] As to the trial court's determination of voluntariness, we will examine the entire record and made an independent determination. *Id.* at 512.

It is apparent from the record that resolution of the conflicting accounts of the circumstances surrounding the confession played the determinative role in the superior court's denial of Van Cleve's motion to suppress and in its finding that the confession was voluntary. After listening to Van Cleve's taped confession and after hearing all the evidence, the court weighed the credibility of Van Cleve's testimony against his self-interest in the matter and against the testimony of the police officers and concluded that "[T]here's nothing in his manner of function that would indicate that—that he was so overborn by this [arrest and interrogation] process that he could not have given the knowing and voluntary consent to the 5th amendment and 4th amendment waivers that were obtained from him." The findings of fact upon which the court's determination was based are supported by the record and are not clearly erroneous. Since our review of this matter is limited, we defer to the superior court's findings of fact.

█ Turning to the next phase in ruling on the admissibility of a confession, we have examined the entire record, and we find that the state has shown by a preponderance of the evidence[7] that Van Cleve's statement was voluntary. The record indicates that Van Cleve's age, intelligence, experience, and functioning ability during the time he was interrogated demonstrate that he was capable of giving a knowing, intelligent and voluntary consent.

We do not accept Van Cleve's argument that his alleged state of intoxication rendered him incapable of giving a knowing and intelligent waiver.[8] In deciding this issue we recognize that one could be so intoxicated that he could not knowingly and intelligently waive his constitutional rights. *Hampton v. State*, 569 P.2d 138 (Alaska 1977). However, we find that the testimony of the police officer who observed Van Cleve at the time of arrest and interrogation provides sufficient proof that he was not so intoxicated. We also find it significant that just one hour prior to his arrest, when Officer Reeder initially stopped Van Cleve on the street, Reeder was of the opinion that Van Cleve was not intoxicated and permitted him to drive home. *See supra* note 3. Finally, we agree with the trial court that any evidence introduced by Van Cleve to negate this finding should be viewed with caution due to "the possibility that his self-interest at this . . . stage motivates some of his statements."

As to Van Cleve's claim that the interview was conducted in a coercive manner, nothing in the record supports that conclusion. The officers made no threats or promises to Van Cleve in exchange for his statement. They did not exert any psychological pressures on him, nor did they question him for a lengthy period of time. Rather, they advised and explained his rights to him, specifically asked him if he wished an attorney present, and questioned him for a brief eight minutes.

Having independently examined the entire record, we conclude that the totality of the circumstances leads to a determination that Van Cleve's confession was voluntarily made. We therefore hold that the superior court did not err in denying Van Cleve's motion to suppress and we accordingly AFFIRM his conviction.

**6.** *Troyer v. State*, 614 P.2d 313 (Alaska 1980), explains that great deference is afforded the trier of fact's resolution of factual findings and testimonial conflicts because of its ability to observe the witnesses' demeanor.

**7.** The supreme court has adopted the "preponderance of evidence" standard for showing the voluntariness of a confession. *Sprague v. State*, 590 P.2d 410 (Alaska 1979); *Schade v. State*, 512 P.2d 907 (Alaska 1973).

**8.** It is undisputed that prior to 2:30 a. m., on November 3, 1979, Van Cleve drank two quarts of malt liquor, at least one beer, and several rum and cokes—the latter amount being unascertained.

## SENTENCE APPEAL

Van Cleve's second point on appeal challenges his twenty-year sentence as excessive. He maintains that in view of his background[9] and good prognosis for rehabilitation,[10] the court should not have focused on the nature of the crime and found deterrence of others and community condemnation to be the significant goals of sentencing.

The appropriate goals of sentencing were established in *State v. Chaney*, 477 P.2d 441 (Alaska 1970). It is within the discretion of the sentencing court to assign priorities among those factors, and its decision will not be disturbed on appeal unless clearly mistaken. *LaLonde v. State*, 614 P.2d 808 (Alaska 1980). In his sentencing remarks the judge clearly indicated that he considered the *Chaney* goals when he found the deterrence of others and the reaffirmation of societal norms to be the primary goals to be achieved. We cannot say that he was clearly mistaken in his evaluation of the *Chaney* factors. Our decision is based on the fact that murder is among the most serious of criminal offenses. Consequently, deterrence of others is an important consideration, and societal norms call for harsh condemnation.[11] Furthermore, because the sentence imposed here is far less than the maximum sentence of life imprisonment permitted for second degree murder under former AS 11.15.030,[12] we cannot say that the sentencing court was clearly mistaken in imposing it. We therefore AFFIRM the sentence.

9. Van Cleve was only 18 at the time of the offense and, other than traffic violations, had no prior criminal record.

10. The sentencing court itself acknowledged that Van Cleve was not a danger to society and that the 20-year sentence was probably not necessary to rehabilitate or deter him. In fact, the court noted that a lengthy period of incarceration might even make Van Cleve "less rehabilitated."

11. The nature of the killing provides a second factor militating against a finding that the sentence is severe. Van Cleve brutally beat a helpless man with a hockey stick. His conduct was neither provoked nor justified in any manner. Rather, as described by the sentencing judge, "The killing appeared to be senseless and motivated solely by cruelty."

12. The potential sentence under former AS 11.-15.030 is imprisonment for a term of not less than 15 years to life.