James A. RIDGELY, Jr., Appellant,

v.

STATE of Alaska, Appellee.

William G. PLUMLEY, Appellant,

v.

STATE of Alaska, Appellee.

Shelley Ann BOSCH, Appellant,

v.

STATE of Alaska, Appellee.

Nos. A–30, A–43 and A–56.

Court of Appeals of Alaska.

Sept. 6, 1985.

A. Harry Branson, Anchorage, for appellant Ridgely.

William J. Pauzauskie, Anchorage, for appellant Plumley.

William Grant Callow, II, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant Bosch.

William H. Hawley, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

PER CURIAM.

James A. Ridgely, Jr., William G. Plumley, and Shelley Ann Bosch were convicted of the murder of Mildred Landesman following separate jury trials. Ridgely and Plumley were convicted of murder in the first degree, AS 11.41.100(a)(1); Bosch was convicted of murder in the second degree, AS 11.41.110. Superior Court Judge Ralph E. Moody sentenced Ridgely to ninety-nine years for first-degree murder, ten years for first-degree burglary, and five years for second-degree theft. AS 11.41.100(a)(1); AS 11.46.300(a)(1); AS 11.46.100(1); AS 11.-46.130(a)(1). These sentences were all to run consecutively. Plumley was sentenced to ninety-nine years for murder in the first degree and ten years, consecutive, for burglary in the first degree. AS 11.41.-100(a)(1); AS 11.46.300(a)(1). Judge Moody sentenced Bosch to ninety-nine years for murder in the second degree and five years for theft in the second degree. AS 11.46.-410(1); AS 11.46.100(1); AS 11.46.130(a)(1). These sentences were also to be served consecutively. Ridgely, Plumley and Bosch appeal their convictions and sentences.

In this *per curiam* opinion, the court sets out the facts and unanimously disposes of a number of issues raised in these consolidated appeals. In the opinion following, Chief Judge Bryner writes for the majority on the dispositive issue of Ridgely's confessions. Judge Coats dissents from the court's disposition of this issue.

## I. FACTS

In mid-August of 1982, Ridgely, Plumley and Bosch hitchhiked out of Anchorage toward Fairbanks. They reached a point near Cantwell (approximately Mile 177 of the Parks Highway) where they planned to stay at a trailer they believed to be owned by a friend's family. They located the trailer, broke the lock and settled in.

The three were aware of the presence of Mildred Landesman, whose Winnebago motor home was located nearby. Mrs. Landesman was initially contacted by Ridgely in order to borrow cigarettes. The three appellants conceived a plan to steal Mrs. Landesman's Buick LaSabre which she parked next to her motor home. Apparently, a decision was made to invite Mrs. Landesman to lunch at the trailer and distract her attention while Ridgely clubbed her over the head with a pickax handle. They would then dispose of her body. The three would consequently be

free to take her car and whatever else she may have had of value in the motor home.

The plan was carried out on August 21, 1982, when Ridgely escorted Mrs. Landesman to the trailer. After Mrs. Landesman entered the trailer she sat down, was distracted as planned by Plumley and Bosch, and was killed by Ridgely, who clubbed her from behind. After disposing of the body, the three changed, gathered their personal items and left the trailer. Ridgely flung the weapon into the woods. The appellants proceeded to the Landesman motor home where they searched for and obtained food and money. Plumley drove the Buick and Ridgely drove the motor home to Mile 170.5 on the Parks Highway, where the motor home was abandoned. Ridgely then rode in the Buick with the others into Anchorage.

## A. THE ARRESTS

At approximately 5:30 a.m. on August 22, 1982, Officer Taylor of the Anchorage Police Department observed a 1973 Buick LaSabre being driven in an erratic manner with its high-beam headlights on. The driver, Plumley, was arrested by Taylor for driving in a reckless manner. Bosch and Ridgely, passengers in the vehicle, were arrested for joyriding. All three were subsequently charged, *inter alia*, with first degree murder.

At the scene of the stop, Taylor asked Plumley to get out of the car. After observing a machete between the driver's door and seat, Taylor asked the other occupants to exit the car. He then frisked Plumley and asked him for identification. He asked Plumley whose car he was driving. Plumley responded that the car was not his and that he had found it near Talkeetna. Taylor then arrested Plumley for reckless driving, handcuffed him and placed him in a patrol car. Plumley was

not advised of his *Miranda* rights at this time.[1]

Four backup officers arrived within minutes of the stop. One of these officers, Officer Feichtinger, assisted Taylor in questioning Ridgely and Bosch. Both Ridgely and Bosch were juveniles. Both were questioned about the ownership of the car and both told the officers the car had been found near Talkeetna. At this point, neither juvenile had been given *Miranda* warnings, nor had they been placed under arrest. Ridgely's parents were not successfully contacted. Bosch's parents were contacted and asked the police to take Bosch to McLaughlin Youth Center (MYC).

At some point during the questioning of Bosch, she indicated to Taylor that the three had taken LSD prior to the stop. Feichtinger was aware of that information prior to questioning Ridgely. Taylor testified Bosch was nervous and had dilated pupils. Feichtinger described Ridgely as "unconcerned" and noted he was shivering.[2]

At the scene, Taylor ran a check on the registration of the vehicle and learned it was registered to a Mildred Landesman. There had been no report of theft by Mrs. Landesman. Ridgely and Bosch were then arrested for joyriding.

After Ridgely was arrested, Feichtinger testified he advised Ridgely of his rights and questioned Ridgely once again. Subsequently, Ridgely and Bosch were transported to MYC where they were detained at approximately 7:00 a.m. The transporting officer indicated to the MYC staff that both may have consumed LSD.

## B. THE POST–ARREST INTERROGATIONS

Following their incarceration, after *Miranda* warnings were given and waived,

---

1. Plumley was transported from the scene to a bail hearing and then to jail. Taylor first advised Plumley of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), while en route to jail, following the bail hearing.

2. Taylor testified that Plumley was wearing wet pants at the arrest. He also testified Plumley did not appear to be intoxicated. The medical technician at the jail, however, believed Plumley was under the influence of drugs based upon his observations.

Ridgely, Plumley and Bosch were each interrogated as follows:

(1) *Ridgely* was interviewed August 22, 1982, from approximately 3:00 p.m. to 8:06 p.m. by Taylor, Feichtinger and Alaska State Trooper Port. Ridgely's father attended the questioning.

(2) *Bosch* was interviewed August 22, 1982, for approximately two hours by Port. Her parents were present. Bosch was confronted with Ridgely's statements and eventually told the story related earlier in this opinion, indicating it was Ridgely who had clubbed Mrs. Landesman to death.

(3) *Plumley* was interviewed August 23, 1982, for approximately two hours by Port. When confronted with both Ridgely's and Bosch's statements, Plumley corroborated Bosch's account of the killing.

(4) *Bosch* was interviewed August 23, 1982, for twenty minutes by Port. She admitted the planning stages of the murder. Her father was present.

(5) *Ridgely* was interviewed on August 23, 1982, for approximately one hour by Port. His father was again present. When confronted with statements from Plumley and Bosch, Ridgely fully confessed. Following this confession, Ridgely asked to see an attorney. Apparently Port immediately ceased the questioning, but did not provide Ridgely with an attorney.

(6) *Plumley* was interviewed August 26, 1982, by Port. The above stories were again confirmed.

## C. PRE–TRIAL SUPPRESSION MOTIONS

Prior to trial, the three appellants moved to suppress their statements. They argued that the statements made at the stop/arrest scene and those made while incarcerated were in violation of their fourth and fifth amendment rights.

In a memorandum decision entered March 11, 1983, Judge Victor D. Carlson denied all but one of the suppression motions, ruling only that Plumley was entitled to have been advised of his rights when Taylor decided to arrest him. Accordingly, Plumley's statements made at the stop scene were suppressed.

## II. THE STATEMENTS AT THE SCENE OF THE STOP

The appellants argue on appeal that the trial court erred in not suppressing various statements which they made after they were stopped by the police.

Ridgely argues that he, Bosch and Plumley were in custody at the scene of the initial stop and that therefore all three were entitled to *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He argues that the trial court's determination that he and Bosch were not in custody at that time was clearly erroneous under *Hunter v. State*, 590 P.2d 888 (Alaska 1979). He argues that if the original statements which the police took from himself and Bosch were illegal, then any further evidence which the police obtained was tainted fruit of those statements. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). He also argues that his statements were derived from Plumley's first statement, which was suppressed by Judge Carlson. Bosch does not raise the argument that her statement at the stop scene was obtained by the police while she was in custody and without giving her *Miranda* warnings. Plumley also argues that Ridgely's and Bosch's rights were violated because the police took statements from them without giving them *Miranda* warnings while they were in custody. He asserts that he was standing to raise the issue of whether Ridgely's and Bosch's rights were violated. Plumley also argues that his later statements were a product of his first statement at the stop scene which Judge Carlson suppressed.

The Alaska Supreme Court has adopted an objective, reasonable person test as the standard for determining custody. In *Hunter,* the supreme court said the inquiry is whether:

> In the absence of actual arrest something ... [is] said or done by the au-

thorities, either in their manner of approach or in the tone or extent of their questioning, which indicates [to the defendant] that they would not have heeded a request to depart or to allow the suspect to do so.

This *requires some actual indication of custody,* such that a reasonable person would feel he was not free to leave and break off police questioning. [Emphasis added.]

590 P.2d at 895, *citing United States v. Hall,* 421 F.2d 540, 545 (2d Cir.1969). The court went on to outline the minimum criteria which would be relevant in determining whether a reasonable person would feel free to leave and break off police questioning:

At least three groups of facts would be relevant to this determination. The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendants said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint ... and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant.... Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Hunter,* 590 P.2d at 895 (Footnotes omitted).

The following facts are thus relevant to this court's review of the trial court's finding that neither Ridgely nor Bosch was in custody at the stop scene prior to a determination to arrest them. Bosch was asked to stand approximately twenty feet west of the car while Plumley was handcuffed and placed in a patrol car shortly after the stop. There were five police officers on the scene. Bosch was questioned intermittently for short periods of time and left unac-

companied when not being questioned by Taylor. Apparently there was a subjective intent on the part of Taylor at the scene to hold Bosch until her parents came to pick her up, but this was not communicated to her. Bosch was asked questions which concerned the ownership of the car.

Ridgely, who apparently was standing closer to the car than Bosch, was initially questioned by Feichtinger for two or three minutes. Feichtinger asked Ridgely a series of questions, concerning ownership of the car. Feichtinger observed that Ridgely was shivering and asked him to sit in the patrol car after the initial questioning. Apparently it was cool out and Feichtinger had asked Ridgely if he wanted to get his coat.

In *Hintz v. State,* 627 P.2d 207 (Alaska 1981), the Alaska Supreme Court applied the *Hunter* factors to a similar set of facts. Hintz had committed rape. The rape was reported by the victim and a call had been put out requesting the Fairbanks police to stop Hintz in the victim's car. The trooper who located the car and stopped Hintz was unaware of the reason for the stop. After the stop, the trooper asked for identification and asked Hintz to sit in his patrol car. Hintz was not given *Miranda* warnings. City Police Officer Kendrick, who also was unaware of the rape information, subsequently arrived and asked Hintz who he was, where he got the car and where the owner was. Hintz gave a false story which was used to impeach him at trial. Shortly thereafter, the officers were informed of the report of rape, and Hintz was then placed under arrest and given his *Miranda* rights.

In *Hintz,* the supreme court determined that Hintz was not in custody until the actual arrest was made and that the false story which he gave in response to police questioning was admissible. The supreme court applied the *Hunter* standards to find:

nothing in the circumstances of the interrogation itself ... leads us [to] believe that appellant was "in custody." Until Officer Kendrick received word that a rape had been reported, he was unaware

that any crime had been committed. His investigation of Hintz was directed solely toward gaining information about suspicious circumstances involving the car Hintz was driving. Such an "investigative detention" is a legitimate police procedure.

627 P.2d at 209.

We conclude that *Hintz* governs the instant case and that Judge Carlson did not err in concluding that Ridgely and Bosch were not in custody at the time they gave their initial statements at the scene of the stop. Judge Carlson could properly conclude that the police investigation of Ridgely and Bosch "was directed solely toward gaining information about suspicious circumstances involving the car [they were riding in]." *Id.* We also conclude, based on *Hintz*, that Judge Carlson did not err in finding that the stop, detention, and questioning of the appellants was reasonable.[3]

### III.  LATER CONFESSIONS

Plumley argues that his later confession to the murder was the product of his first statement to the police that he found the car and did not know whose car it was. Judge Carlson suppressed the original statement, but held that Plumley's later confession to murder was not a product of his earlier statement. Plumley argues that Judge Carlson erred in reaching this conclusion.

In *United States v. Bayer*, 331 U.S. 532, 541, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654, 1660 (1947), the Supreme Court said:

> Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of psychological and practical advantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as the fruit of the

first. *But this court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.* [Emphasis added.]

*See also Hampton v. State,* 569 P.2d 138, 145 n. 14 (Alaska 1977), *cert. denied,* 434 U.S. 1056, 98 S.Ct. 1225, 55 L.Ed.2d 757 (1978); *Soolook v. State,* 447 P.2d 55 (Alaska 1968), *cert. denied,* 396 U.S. 850, 90 S.Ct. 107, 24 L.Ed.2d 99 (1969).

It appears to us that Judge Carlson could properly conclude that Plumley's confession to murder was not a product of his first statement. Plumley had been warned of his rights before his subsequent confession and over twenty-four hours had elapsed from his first statement. Plumley's statement that he found the car was very different from his statement in which he implicated himself in the murder of Mrs. Landesman. It seems clear that the police would have checked the car registration, found that the car was registered to Mrs. Landesman and would have attempted to contact her regarding the stolen car regardless of Plumley's original statement. It also does not appear that Plumley's statement about finding the car influenced the later murder confessions of Ridgely and Bosch. Rather, Plumley's confession given after receipt of his *Miranda* warnings seems to have been influenced not by his initial confession, but by the confessions of Ridgely and Bosch. We conclude that Judge Carlson's findings that Plumley's confession was not a product of his statement that he had found the car was not clearly erroneous.

### IV.  VOLUNTARINESS OF CONFESSIONS

The scope of appellate review as to the voluntariness of a confession is twofold. The trial court's findings of fact will

---

**3.**  In light of our holding that Judge Carlson's finding that Ridgely and Bosch were not in custody at the stop scene was not clearly erroneous, we also reject Ridgely's contention that he and Bosch were unreasonably seized at the stop scene. *Waring v. State,* 670 P.2d 357 (Alaska 1983).

be reversed only where clearly erroneous. And, as to the trial court's determination of voluntariness, we must make an independent determination based on the entire record. *Van Cleve v. State*, 649 P.2d 972, 975–76 (Alaska App.1982).

"A confession is not admissible into evidence unless it is voluntary. In determining whether a confession is the product of a free will or was the product of a mind overborne by coercion the totality of circumstances surrounding the confession must be considered." *Ladd v. State*, 568 P.2d 960, 967 (Alaska 1977) (citations omitted).... Among the circumstances which should be considered on the issue of voluntariness of a confession are:

The age, mentality and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.

*Sovalik v. State*, 612 P.2d 1003, 1006 (Alaska 1980), *quoting Sprague v. State*, 590 P.2d 410, 414 (Alaska 1979), *quoting Brown v. United States*, 356 F.2d 230, 232 (10th Cir.1966).

Judge Carlson's findings as to the appellants' voluntariness can be paraphrased as follows:

(1) Officer Taylor found Bosch and Plumley to be responsive and oriented at the scene of the stop.

(2) The three were not under the influence of drugs or lack of sleep to the extent they were impaired in understanding what occurred or in asserting their rights on August 22, 1982. There was no suggestion any of the three were under the influence of alcohol.

(3) Ridgely's father was present at all "critical stages" on August 22 and 23.

(4) The police assiduously respected Ridgely's rights.

(5) Ridgely's father was not enlisted by, nor was he an agent of, the police, and did not pressure his son into confessing to murder.

(6) Ridgely has a greater capacity to understand and cope with the world than the evidence portrayed.

(7) Bosch had (both or one) parent(s) present at both interviews and waived her rights.

### A.  PLUMLEY'S CONFESSIONS

■ Plumley argues that Judge Carlson erred in determining that his confessions were voluntary. Plumley points out that he was only eighteen; had only a sixth grade education; that there was evidence that he was under the influence of LSD, alcohol and marijuana when he was arrested; and that he was confused about his right to the assistance of counsel. However, the record reflects that Plumley had obtained his G.E.D. He had a prior juvenile record which would indicate some experience with police and police procedures. His actual confessions were well over twenty-four hours after his arrest and there was substantial evidence in the record that his responses were not influenced by drugs or alcohol. It also appears that Plumley was aware of his right to an attorney, however, he was willing to talk with the police without an attorney and only indicated he wanted an attorney in court. We conclude that Plumley's confessions were voluntary.

### B.  BOSCH'S CONFESSIONS

■ Bosch argues that her confessions were taken as a result of a waiver of her rights which was not knowingly, intelligently and voluntarily made. She says neither she nor her parents realized on August 22, 1982, that she was being investigated for complicity to murder nor that she could be adjudicated as an adult.[4]

---

**4.** In her reply brief, Bosch argues that before she made a statement she should have been advised that she could be tried as an adult. *See,*

*e.g., Harling v. United States*, 295 F.2d 161 (D.C. Cir.1961); *State v. Maloney*, 102 Ariz. 495, 433

Judge Carlson found that Bosch had voluntarily waived her rights. He found that she was not under the influence of drugs or suffering from a lack of sleep so that it would impair her ability to understand or assert her rights. He noted that Officer Taylor had found Bosch to be responsive and alert at the stop scene and that there was other testimony which indicated Bosch was not acting as though she was impaired on August 22, the day of her first interview. Judge Carlson also noted that she had both of her parents present during the interview which took place on August 22, 1982, and that her father was present during the August 23 interview. All these findings are supported by the record.

Although Bosch did not confer with her parents before making her statements, she had a full opportunity to do so. There is language in *Quick v. State*, 599 P.2d 712, 718–20 (Alaska 1979), which indicates that the better practice is to have the juvenile actually consult with an adult, such as a parent, before questioning; however, that

case also indicates that actual consultation is not required.

■ Bosch and her parents were made aware that Bosch was not being questioned just on the charge of joyriding, but on a more serious matter. It does not appear that there was any intentional attempt to mislead Bosch as to her situation. Based on an independent review of the record, we conclude Judge Carlson did not err in finding Bosch's statements were voluntary.[5]

BRYNER, C.J., for a majority of the court.

COATS, J., dissents.

BRYNER, Chief Judge.

■ Ridgely argues that he lacked sufficient knowledge and maturity to make a voluntary waiver of his *Miranda* rights. After an independent review of the entire record we are convinced that the state has failed to meet its heavy burden of establishing that Ridgely waived his *Miranda* rights and responded to interrogation knowingly, intelligently and voluntarily.[1]

---

P.2d 625 (1967); and *State v. Councilman*, 105 Ariz. 145, 460 P.2d 640 (1969).

This issue is not properly before this court because Bosch did not raise it until her reply brief. Alaska R.App.P. 212(c)(3); *Nell v. State*, 642 P.2d 1361, 1370 (Alaska App.1982). This does not appear to be the kind of issue where we should relax the appellate rules. *See Moreau v. State*, 588 P.2d 275, 280 (Alaska 1978). We therefore decline to decide this issue.

5. Bosch also moved for a pretrial protective order to prohibit the admission into evidence of color photographs taken of Mrs. Landesman's body at the scene of the homicide and during the autopsy. The motion was denied on the ground that the photographs were relevant to show there was an intent to kill the victim. She contends the denial of her motion was erroneous and the trial court abused its discretion by admitting the evidence because the photographs were prejudicial.

We reject Bosch's claim and conclude the photographs were necessary to demonstrate the pathologist's testimony. We have reviewed the photographs and the testimony and conclude the trial court did not err. *See* A.R.E. 403; *Sheakley v. State*, 644 P.2d 864, 870 (Alaska App.1982).

1. The contours of the legal terrain in this area are familiar: the state bears the heavy burden of establishing a knowing and intelligent *Mi-*

*randa* waiver and a voluntary confession. *S.B. v. State*, 614 P.2d 786, 789 (Alaska 1980); *Troyer v. State*, 614 P.2d 313, 317 (Alaska 1980). Voluntariness of both the waiver and the confession must be established by a preponderance of the evidence, *Giacomazzi v. State*, 633 P.2d 218, 222 n. 4 (Alaska 1981); *McMahan v. State*, 617 P.2d 494, 498 (Alaska 1980), *cert. denied*, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981); and in cases involving juveniles, the burden is a particularly heavy one. *S.B. v. State*, 614 P.2d at 789 n. 5; *Quick v. State*, 599 P.2d 712, 720 (Alaska 1979). In deciding questions of voluntariness, the trial court must consider the totality of the circumstances in each case. *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); *Quick v. State*, 599 P.2d at 720.

On appeal of a trial court's ruling on the admissibility of a confession, we apply a twofold standard: as to purely factual matters we accept the trial court's findings unless they are clearly erroneous; as to matters involving the accused's state of mind and the ultimate issue of voluntariness, we have a duty to examine the entire record and make an independent determination. *Giacomazzi v. State*, 633 P.2d at 222; *Troyer v. State*, 614 P.2d at 318; *Johnson v. State*, 631 P.2d 508, 512 (Alaska App.1981) This bifurcated standard applies equally in cases involving the voluntariness of *Miranda* waivers

On the day of his arrest, Ridgely was sixteen years of age. He had completed school only through the ninth grade, performing poorly. Ridgely's full scale I.Q. score is 78, placing him in the borderline mentally deficient range of overall function, a result that clearly suggests poor comprehension skills. Police arrested Ridgely at approximately 6 a.m.; he had apparently been awake all night. At the time of the arrest there was reason to believe Ridgely and his companions were under the influence of LSD or other controlled substances.

Later that day, at approximately 3 p.m., the police recontacted Ridgely and subjected him to interrogation. There is nothing in the record to suggest that Ridgely had been permitted to sleep prior to the interrogation, and police made no inquiry in this regard.

At the McLaughlin Youth Center (MYC), when the police first contacted Ridgely, after his incarceration, he began crying uncontrollably. He appeared to be under the influence of drugs and told the police that he was "coming down from" a dose of LSD. After regaining his composure, however, Ridgely was able to respond rationally to questions during the balance of the interrogation. The police questioned Ridgely for a total of five hours. Three hours elapsed before Ridgely initially confessed, implicating himself and his companions in Mrs. Landesman's murder. During the interrogation, the police made little effort to ascertain Ridgely's physical or mental condition. No attempt was made to record the three-hour portion of the interrogation which occurred prior to Ridgely's initial confession.

■ Ridgely's father was brought into the interrogation soon after it began and participated actively at times in the questioning of his son. The lack of a recording makes it difficult to gauge the precise extent of his participation. The trial court nevertheless determined that Ridgely's father did not act as an agent of the interrogating officers. While this finding is not clearly erroneous and must therefore be accepted, the trial court's finding further makes it clear that Ridgely's father displayed little genuine concern for his son or for the protection of his son's rights.

Twice during the initial three-hour period of interrogation, the police read Ridgely his *Miranda* rights. Twice Ridgely responded by asking about the advisability or feasibility of obtaining an attorney. The police made a brief attempt in each instance to clarify Ridgely's inquiries, and in each instance Ridgely quickly responded by indicating that he preferred to proceed without counsel. The police accepted Ridgely's statements without further inquiry and proceeded with the interrogation. It is unclear whether Ridgely's father was ever asked whether he understood his son's *Miranda* rights or whether he had a preference with respect to his son's assertion of those rights. Nor does it appear Ridgely's father was asked whether he thought his son was capable of understanding and voluntarily waiving his *Miranda* rights.

After three hours of questioning by his father and two officers, Ridgely finally incriminated himself and his companions in the homicide. It was only at this point that a tape recording of Ridgely's interrogation was begun.

The historical facts surrounding Ridgely's interrogation were, for the most part, not disputed. Rather, the determinative factor in the trial court's decision of the voluntariness issue seems to have been Judge Carlson's interpretation of the historical facts—the judge's conclusions about the manner in which the circumstances surrounding the interrogation affected Ridgely's state of mind, his ability to understand his situation and his capacity to make voluntary and informed decisions. Judge Carlson elected to emphasize the significance of Ridgely's apparently rational responses to the police interrogation, concluding that his waiver of the *Miranda* rights was knowing and that his confession was voluntary.

and the voluntariness of confessions. *See Gia-* *comazzi,* 633 P.2d at 222.

■ It is precisely in this area—the matter of drawing inferences from the historical facts concerning the accused's state of mind—that an appellate court ceases to be bound by the clearly erroneous standard of review and must instead exercise its independent judgment on the issue of voluntariness. *See Giacomazzi v. State*, 633 P.2d at 222; *Johnson v. State*, 631 P.2d at 512. Having accepted, with full deference to the trial court's factfinding role, those findings of fact most compatible with the position advocated by the state, we nevertheless find ourselves unable to agree, after an independent review of the record, with the conclusions drawn by the trial court from those facts.

The picture of Ridgely that emerges from the record is that of a young offender who—although obviously dangerous and profoundly antisocial—is immature, unsophisticated and severely limited in his intellectual ability.[2]

■ The myriad factors casting doubt on the voluntariness of Ridgely's *Miranda* waiver and confession include Ridgely's youth, his poor levels of educational and intellectual performance, his apparent lack of sleep and consumption of drugs, his extremely agitated emotional state at the beginning of the interrogation, his repeated but abortive inquiries regarding counsel, the prolonged period of his detention *incommunicado* prior to interrogation, the lack of any demonstrated genuine concern for Ridgely's welfare by his father, the presence of two police officers during the untaped interrogation, and the lengthy period of interrogation prior to the initial confession. We believe these factors significantly preponderate over the factors which indicate voluntariness.[3] On balance,

we are unconvinced that Ridgely's *Miranda* waiver was knowing and intelligent or that his confession was voluntary. Although Ridgely had been involved with the juvenile justice system on several occasions and was represented by counsel at least once, the extent to which these experiences affected Ridgely's ability to understand his legal options is questionable, since the record does not indicate whether Ridgely was previously subjected to custodial interrogation. There is, similarly, little to shed light on the extent to which Ridgely was capable of understanding, in any meaningful sense, the juvenile proceedings in which he had previously been involved or the legal counsel he had previously received. Since the state bears the burden of proof on these matters, we must conclude that Ridgely's confession should not have been used in evidence against him.

■ We take this occasion to explain the effect on our conclusion of the state's failure to record Ridgely's full interrogation. In *Harris v. State*, 678 P.2d 397 (Alaska App.1984), *rev'd* (Alaska Supreme Court Order, February 1, 1985) (opinion to follow), we held that the police are under a constitutional duty to record the entirety of custodial interrogations, beginning with the *Miranda* warnings. While we indicated that suppression was not ordinarily an appropriate sanction for violation of the state's duty to record, we emphasized that failure to record was a factor that could appropriately be considered in deciding the issue of voluntariness in individual cases. *Harris*, 678 P.2d at 404–05.

■ Here, if a recording of the full interrogation had been made and preserved, it would have borne directly on Ridgely's mental state, demonstrating the

---

**2.** We are not suggesting that Ridgely's lack of sophistication or his educational and intellectual shortcomings would excuse his conduct or mitigate his responsibility for the offense. In determining the voluntariness of Ridgely's confession, however, it is vital not to confuse his antisocial conduct and insensitivity to the rights of other with intellectual maturity or a capacity for meaningful understanding of legal rights and options.

**3.** Factors indicating voluntariness include the presence of Ridgely's father and his acquiescence in the interrogation, the apparent rationality of Ridgely's responses to questioning, Ridgely's prior experience in the juvenile system, the thorough manner in which Ridgely was apprised of his *Miranda* rights, his express statements that he did not wish to wait to consult with an attorney, and the lack of overt threats, promises or coercion during the interrogation.

extent of his awareness, his ability to understand, and his willingness to cooperate. A recording might also have resolved the significant conflict in evidence concerning the role Ridgely's father played in his son's interrogation. There was no apparent impediment to recording the full interrogation in this case. This evidence was thus readily available to the state; the state had a duty to preserve it but it failed to do so. Since the burden of establishing voluntariness falls squarely on the state's shoulders, any doubt in the appellate record as to the appropriate resolution of the voluntariness issue must be resolved against the state.[4]

■ We must accordingly REVERSE Ridgely's conviction and REMAND his case for a new trial. The question of whether the confessions of Plumley and Bosch should have been suppressed as products of Ridgely's confession is more problematical. *See Waring v. State*, 670 P.2d 357, 359–63 and n. 4 (Alaska 1983); *see also Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453–54 (1963). This issue, however, is one that would ultimately require resolution of factual questions not yet considered or addressed by the trial court. We therefore REMAND the cases of Plumley and Bosch for further proceedings to determine their standing to challenge the admissibility of evidence possibly deriving from Ridgely's confession.[5]

COATS, Judge, dissenting.

I respectfully dissent from the majority's disposition regarding Ridgely's confes-

sions. Judge Carlson made the following findings in concluding that Ridgely's statements were voluntary:

(1) Ridgely was not under the influence of drugs or lack of sleep to the extent he was impaired in understanding what occurred or in asserting his rights on August 22, 1982.

(2) Ridgely's father was present at all "critical stages" on August 22 and 23.

(3) The police assiduously respected Ridgely's rights.

(4) Ridgely's father was not an agent of the police and was not enlisted by the police to help them. Ridgely was not pressured into confessing by his father.

(5) Ridgely has greater capacity to cope with and understand the ways of the world than the evidence presented would suggest.

I have conducted an independent review of the record and conclude that Judge Carlson's findings are supported by the record. Although Ridgely's age and low intelligence are a cause for concern, it appears that he was capable of understanding his situation and of waiving his rights. He appears to have had prior experience with the police and courts as a juvenile. *See Sovalik v. State*, 612 P.2d 1003, 1007 (Alaska 1980). He was able to consult with his father and to have him present during questioning. *See S.B. v. State*, 614 P.2d 786 (Alaska 1980).[1]

---

**4.** Our decision in *Harris* has recently been reversed by an order of the supreme court, which will be followed in due course by a full opinion. The supreme court's order is without precedential effect, and in the absence of an opinion by the court, it is impossible to predict the extent to which the supreme court's decision in *Harris* will affect this case. Since the application of this court's *Harris* decision in this case benefits Ridgely, a result consistent with the supreme court's recent order in *Harris,* we do not believe it inappropriate to rely on our *Harris* ruling in this case.

**5.** The three defendants additionally appeal their sentences as excessive. Our disposition of these cases precludes us from deciding their sentence appeals at this time. Nor do we reach the issue

of whether the court erred in failing to give a manslaughter instruction at the close of Ridgely's trial.

**1.** *S.B. v. State* was another matter concerning a juvenile confession. S.B. was fourteen years old at the time he gave a confession. In that case, the court said:

S.B.'s age and indicated lack of maturity for his age are grounds for questioning his capacity for making a reasoned decision by himself as to whether to confess. However, his parents were present with him throughout the interrogation, and were thus informed as well as he of the nature of the charges against their son and his *Miranda* rights. S.B. was able to consult with his parents in private prior to

From the testimony of Officer Feichtinger, it appears that Ridgely's father was made aware of the possibility that the incident which the police were investigating could be very serious. I believe that Judge Carlson's finding concerning the nature of Ridgely's father's participation in the questioning is supported by the record.

I also believe Judge Carlson could rely on police testimony in the record to conclude that even if Ridgely was under the influence of alcohol or drugs he was not impaired to the point that he could not voluntarily waive his rights. See *Mallott v. State*, 608 P.2d 737, 743 (Alaska 1980); *Hampton v. State*, 569 P.2d 138 (Alaska 1977), *cert. denied*, 434 U.S. 1056, 98 S.Ct. 1225, 55 L.Ed.2d 757 (1978). Feichtinger described Ridgely as "rational" at the scene of the stop. Taylor described him as "unconcerned." Taylor testified Ridgely cried prior to the interview, that he had dilated pupils and was "partially under the influence of drugs." Ridgely had told him that he was coming down off an LSD trip. Taylor, however, also testified that Ridgely was entirely lucid.

The record reflects that Ridgely asked about whether he had a right to have an attorney present. However, it does not appear from the questions Ridgely asked that he was actually requesting an attorney. According to the police testimony, when Ridgely subsequently asked questions about the availability of an attorney at MYC, he was assured that if he wanted and asked for an attorney all questioning would stop. After being told this Ridgely indicated that he wanted to continue to talk.[2] The record further indicates that when Ridgely did unequivocally say that he wanted an attorney, the police stopped questioning him even though Ridgely volunteered that he wanted to continue to talk.[3] On this record Judge Carlson could properly find that the police fully respected Ridgely's right to counsel. I also conclude, based upon an independent review of the record, that Ridgely's confessions were voluntary. I would affirm the conviction.

talking to the police officer. S.B.'s father's testimony indicates his understanding of his son's *Miranda* rights. These factors would lead us to conclude that the waiver was made knowingly and intelligently.
*S.B. v. State*, 614 P.2d at 789 (footnotes omitted).

2. *See Giacomazzi v. State*, 633 P.2d 218, 222–23 (Alaska 1981), where the supreme court held that it was not error to tell a suspect that it would take some time before an attorney would be appointed, provided the accused is adequately informed that he has a right to remain silent until an attorney is present.

3. It is apparent from the record that Ridgely knew how to exercise his right to have an attorney present during questioning.