STATE of Alaska, Petitioner,

v.

James A. RIDGELY, Jr., Respondent.

No. S–1197.

Supreme Court of Alaska.

Feb. 13, 1987.

---

W.H. Hawley, Asst. Atty. Gen., Anchorage, and Harold M. Brown, Atty. Gen., Juneau, for petitioner.

Harry Branson, Anchorage, for respondent.

## OPINION

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

MOORE, Justice.

Respondent James Ridgely, a 16–year-old, was one of three persons indicted for murder and other charges connected with the death of Mildred Landesman in August, 1982. Prior to trial, Ridgely and his alleged accomplices, 18–year-old William Plumley and 17–year-old Shelley Bosch, moved to suppress all of their statements to law enforcement officials, including a confession by Ridgely. After a hearing, the trial judge denied the motion. Ridgely and Plumley were subsequently convicted in separate trials of first degree murder, and Bosch was convicted of second degree murder. The trio appealed on several grounds, including denial of the motion to suppress. The court of appeals reversed the trial judge's decision as it related to Ridgely's confession, holding that the state had not met its burden of proving that the confession was voluntary and that Ridgely had effectively waived his *Miranda* rights. Without reaching the other issues raised on appeal, the court of appeals reversed Ridgely's conviction, remanded Ridgely's case for a new trial, and remanded Plumley's and Bosch's cases for further proceedings to determine the admissibility of evidence derived from Ridgely's confession. *Ridgely v. State,* 705 P.2d 924, 932, 935 (Alaska App.1985). We reverse as to the voluntariness issue and remand for consideration of the remaining issues raised on appeal.

## I. THE RECORD

Evidence presented at the suppression hearing consisted of testimony by the three law enforcement officers who interrogated Ridgely, an affidavit executed by Ridgely's father, and expert psychiatric testimony. The following story emerges from the record.

Shortly after 5:00 a.m. on August 22, 1982, Anchorage police officer Timothy Taylor observed a car driving erratically. Officer Taylor stopped the car, which contained Ridgely, Plumley, Bosch, and a fourth person who was not involved in this case. Taylor arrested the driver, Plumley, for reckless driving. Officer Feichtinger arrived at the scene a few minutes later. Taylor and Feichtinger questioned the occupants about the car's ownership. Bosch and Ridgely indicated that the car was stolen. The officers arrested Ridgely, Plumley and Bosch for joyriding, gave them their *Miranda* warnings, and took Plumley to jail and Ridgely and Bosch to McLaughlin Youth Center.

### A. *Ridgely's condition at 5:00 a.m.*

Officer Feichtinger had two conversations with Ridgely at the scene of the traffic stop. One conversation lasted for two to three minutes; the other lasted for four to five minutes. In Feichtinger's view, Ridgely's speech was normal. Ridgely seemed to understand the questions Feichtinger asked, and his responses were rational. Feichtinger described Ridgely's demeanor as "calm" and "unconcerned."

The officers found empty beer cans in the back of the car, but Feichtinger testified that Ridgely did not appear intoxicated.

Bosch indicated to Taylor that she, Plumley, and Ridgely had all taken LSD. But Ridgely told Feichtinger that he had not taken LSD, although Bosch and Plumley had. The officers did not find any evidence of LSD consumption, and Feichtinger observed that Ridgely's pupils were reacting normally to light. Nevertheless, when Feichtinger booked Ridgely and Bosch into McLaughlin at about 7:00 a.m., he told the staff that the two might have consumed LSD.

### B. *Ridgely's condition at 3:00 p.m.*

Feichtinger and Taylor returned to McLaughlin at about 3:00 p.m. to question Ridgely further. There is no evidence in the record as to what Ridgely did in the interim, except that he was allowed to try (unsuccessfully) to reach his father by telephone.

When the officers first contacted Ridgely that afternoon, Ridgely began to cry. While he was crying, he "blurted out" that he was very concerned about his friend Bill Plumley, because "Bill could spend a lot of time in prison for what he'd done." Ridgely cried for a couple of minutes, and then regained his composure.

Ridgely told the officers that he was "coming down off a trip on LSD." Officer Taylor thought he might in fact have been under the influence of some kind of drug because his pupils were dilated. Otherwise, Taylor thought that once Ridgely had regained his composure, he was lucid and "entirely fine."

### C. *Initial contact with Ridgely's father*

Officer Feichtinger testified that prior to contacting Ridgely that afternoon, he telephoned Ridgely's father, James Ridgely, Sr. Feichtinger told the father that his son had been charged with joyriding, but that the officers suspected the son was not telling the whole truth about the stolen car and wanted to question him further. Feichtinger explained that the car was registered to an older woman living alone, and state troopers had found the woman's motorhome ransacked. The father told Feichtinger that he preferred not to get involved, and declined to come to McLaughlin.

Nevertheless, the officers informed Ridgely almost immediately that he had a right to have his parents present during any interview that might be conducted. Ridgely indicated that he would like to

have his father present, and was allowed to call him. The father arrived fifteen to twenty minutes later. There was no questioning during that time. When the father arrived, the officers told him that they suspected "foul play." The father and son talked privately for fifteen to twenty minutes, and then the officers joined them.

Mr. Ridgely, Sr. was not available to testify at the suppression hearing because, shortly before the hearing, he was murdered in Joliet, Illinois. However, before his death, he had executed an affidavit describing his perception of his role in his son's questioning.

In the affidavit, Ridgely, Sr. averred that he realized "something more serious than usual" was wrong when his son called him. He admitted that the officers told him they suspected his son of "foul play," but claimed he didn't know what they meant by that. The father tried to help the officers get to the truth, "thinking that joyriding wasn't that bad and he maybe could get a reduced sentence by telling the truth ... James told his story and I kept tearing it apart with the officers ... At no time until the final interview did I have any idea that he had actually been physically involved in the killing."

### D. *The interviews*

Ridgely burst into tears before Officers Taylor and Feichtinger could advise him of his *Miranda* rights when they arrived at McLaughlin Youth Center that afternoon. However, Taylor read Ridgely his rights as soon as he regained his composure, and before any questioning began. Ridgely asked Taylor whether he should have an attorney. Taylor replied that if he wanted a lawyer, all questioning would cease. Ridgely responded that he didn't want a lawyer after all.

After Ridgely's father arrived, Feichtinger re-advised Ridgely of his *Miranda* rights. Ridgely then asked whether a lawyer was present at McLaughlin. Feichtinger answered that no lawyer was on the premises, but if Ridgely wanted one, there would be no questioning until the lawyer arrived. Ridgely asked how long it would take to get a lawyer, and Feichtinger told him it would take several hours, but emphasized that they would wait. Ridgely responded that he didn't want a lawyer. Apparently, the officers did not ask the father if he understood his son's rights or if he wanted his son to waive them.

The officers interrogated Ridgely for approximately four and a half hours that afternoon. At first, Ridgely maintained that he, Plumley, and Bosch had "found" the car they were arrested with. Then, he admitted that there had been a homicide, but attempted to place all the blame on Plumley.

After about two and a half hours, Investigator Rollie Port of the State Troopers arrived. The officers set up a tape recorder for the first time. Feichtinger re-advised Ridgely of his *Miranda* rights on tape, and Ridgely executed a written waiver. For approximately two more hours, on tape, Ridgely elaborated on a story that Plumley had killed Mrs. Landesman and that his own involvement had been only in disposing of the body.

Throughout the interview, Ridgely answered questions clearly and rationally. He described events in detail, remembering such minutiae as the kinds of cars the trio had hitched rides in, and where he had bought cigarettes. He attributed to himself all the "appropriate" emotions, such as repulsion and fear when Plumley supposedly killed Landesman. At the end of the interview, Ridgely asked for "protection," saying "I know Bill's got friends that will go to the extreme trouble if he finds out that I did narc on him, that will definitely shoot me. And I'm scared that's gonna happen to me."

After leaving Ridgely that evening, Investigator Port interviewed Bosch and Plumley. The next afternoon, Port returned to McLaughlin and interviewed Ridgely again. Again, Port advised Ridgely of his *Miranda* rights and Ridgely signed a written waiver. Ridgely's father was present, and the entire interview was tape recorded.

During this interview, Port confronted Ridgely with Bosch's and Plumley's statements. Ridgely then confessed to inviting Mrs. Landesman to dinner as a ruse, bludgeoning her to death with a pick axe handle, helping conceal her body, and stealing her car and other possessions. After approximately two hours, Ridgely said he wanted a lawyer and the interview ended.

### E. *Participation of Ridgely's father*

Mr. Ridgely, Sr. was present during most of the interrogation on both August 22 and 23. Evidently he took a fairly active role in the questioning. Feichtinger testified that the father took notes and asked his son questions as they occurred to him. The father questioned Ridgely alone four or five times. And, at least twice, Feichtinger asked the father to step out of the interview room so that they could talk privately outside the son's presence. On these occasions, they spoke "[b]asically about what he felt or I felt about what was being said in the questioning ... it would have been something like the father saying I'm not too sure about this particular point, or he would—he would ask me whether I felt that the true story was being said and that kind of thing and I'd respond according to whatever it was I felt." Feichtinger insisted that no plan of questioning was developed. In addition, the father frequently expressed disbelief in Ridgely's statements, either explicitly or through body language.

### F. *Psychiatric testimony*

At the suppression hearing, the trial judge took judicial notice of psychiatric testimony presented at an earlier hearing and admitted into evidence a letter from psychologist Thomas Robinson describing intelligence tests performed on Ridgely.

Ridgely had successfully finished 8th grade but had a spotty high school record. Dr. Robinson determined that Ridgely had a full-scale IQ of 78 and functioned at the high end of the Borderline Mentally Deficient range.

Dr. David Coons, a psychiatrist, testified that Ridgely had a long history of drug abuse, centering on marijuana and LSD. He diagnosed Ridgely as exhibiting an adolescent conduct disorder known as undersocialized aggressive reaction, but did not seem to think that Ridgely was profoundly impaired, either emotionally or intellectually.

Ridgely had a juvenile criminal record, including charges of drug possession and burglary.

## II. ISSUE AND STANDARD OF REVIEW

■ The principal issue presented by this appeal is whether Ridgely's confession was voluntary. When an appellate court reviews a trial judge's determination of voluntariness, its standard of review reflects the mixed factual and legal nature of the voluntariness inquiry. The voluntariness inquiry involves three steps. First, the trial judge must find the external, phenomenological facts surrounding the confession. Second, from these external facts, the judge must infer an internal, psychological fact: the mental state of the accused. Finally, the judge must assess the legal significance of this inferred mental state. *Troyer v. State*, 614 P.2d 313, 318 (Alaska 1980), *quoting United States v. Brown*, 557 F.2d 541, 547–8 (6th Cir.1977).

■ The first step of the inquiry, determining historical fact, is a pure fact-finding task requiring weighing the credibility of witnesses. Therefore, the appellate court must defer to the trial judge's findings of historical fact and overturn them only if they are clearly erroneous. However, the appellate court has a duty to examine the entire record and make its own independent determinations as to the mental state of the accused and its legal significance. These determinations are to be based on the totality of the circumstances surrounding the confession. *Troyer*, 614 P.2d at 318.

■ The state bears the burden of proving the voluntariness of a *Miranda* waiver and of a confession by a preponderance of the evidence. *Giacomazzi v. State*, 633

P.2d 218, 222 n. 4 (Alaska 1981). This burden is particularly heavy in cases involving juveniles. *S.B. v. State*, 614 P.2d 786, 789 n. 5 (Alaska 1980).

## III. THE TRIAL JUDGE'S FINDINGS OF FACT

In denying Ridgely's motion to suppress, the trial judge made the following findings of fact. All are amply supported by the record.

1. Ridgely was not under the influence of drugs or suffering from lack of sleep "to the extent that [he was] impaired in understanding what was occurring or in asserting [his] rights on August 22."

2. Ridgely was not under the influence of alcohol.

3. Ridgely was advised of his *Miranda* rights when he was taken into custody on August 22 and when he was interviewed later that day and the following day.

4. The officers "assiduously respected Ridgely's rights."

5. Ridgely asked to have his father present and his father was present during "all critical stages on August 22." The father was also present when Ridgely was interviewed on August 23.

6. The officers "did not enlist nor seek the assistance of Ridgely's father in their interrogation. Mr. Ridgely, Sr .... did not act as an agent of the police."

7. Ridgely's father "participated sporadically" in the interviews.

In addition, the trial judge noted that "I have made these decisions without relying upon the past experience and relative sophistication of the defendant in the ways of the criminal justice process. Parenthetically I want to comment that Ridgely impresses me as having greater capacity to understand and cope with the ways of the world than the evidence about his intelligence would indicate."

## IV. "TOTALITY OF CIRCUMSTANCES" ANALYSIS

### A. *Background factors; age, intelligence, drug usage, etc.*

■ Among its reasons for finding that Ridgely had not voluntarily confessed, the court of appeals listed Ridgely's age, intelligence, "apparent lack of sleep and consumption of drugs," agitated emotional state at the beginning of the interrogation, and "prolonged period of detention incommunicado." *Ridgely v. State*, 705 P.2d 924, 934 (Alaska App.1985). We do not agree that these "background factors" cast doubt on the voluntariness of Ridgely's waiver and confession. The court of appeals' analysis diverges both from the trial judge's findings of fact and from the record.

The court of appeals' suggestion that Ridgely was impaired by lack of sleep and consumption of drugs directly conflicts with the trial judge's finding that Ridgely was not so impaired. This finding is of the historical variety which mandates deference unless clearly erroneous. The finding is not clearly erroneous. At the time of the arrest, Ridgely denied having taken LSD and showed no symptoms of being under the influence of drugs. Though he later claimed to be "coming down off a trip on LSD," the trial judge could reasonably choose to believe only the earlier statement.

The record is silent regarding lack of sleep. However, it is clear that the officers waited eight hours after booking Ridgely into McLaughlin before returning to interrogate him. Evidence as to what Ridgely did during these eight hours would have been helpful. But the record as it stands does not give rise to an inference of deprivation of sleep which the state was required to rebut.

The court of appeals' suggestion that Ridgely was detained "incommunicado" for a prolonged period is not supported by the record. To the contrary, McLaughlin officials allowed Ridgely to telephone his father, who did not happen to be home.

The evidence pertaining to Ridgely's intelligence is ambiguous. On the one hand, Ridgely's IQ of 78 is below average. But on the other hand, Dr. Coons suggested that while Ridgely did have problems in math, he was neither psychotic nor profoundly organically impaired, and "in general understood his situation."

We agree with the court of appeals that Ridgely's brief crying spell on the afternoon of August 22 is some evidence of stress or emotional immaturity. But this evidence is overshadowed by the fact that Ridgely regained his self-control within minutes and remained composed throughout the interview.

The court of appeals lists the apparent rationality of Ridgely's answers, his prior experience with the juvenile justice system, and the lack of overt threats, promises, and coercion during the interrogation as factors weighing in favor of a determination of voluntariness. 705 P.2d at 934, n. 3. To this we add that Ridgely exhibited persistence, imagination, and manipulativeness as he attempted to pin the blame on Plumley for the duration of a four and a half hour interview.

Deferring to the trial judge's finding that Ridgely was not impaired by drugs or lack of sleep, and independently reviewing the record as it pertains to other background factors, we conclude that Ridgely was fully capable of knowingly, voluntarily, and intelligently waiving his *Miranda* rights and of voluntarily confessing.

B. *Did Ridgely attempt to invoke his Miranda rights?*

The court of appeals listed Ridgely's "repeated but abortive inquiries regarding counsel" as a factor undermining voluntariness. 705 P.2d at 934. Apparently, the court of appeals was concerned that Ridgely was attempting to invoke his *Miranda* rights despite his execution of the written waivers. The record sets this concern to rest.

There is no dispute that the officers correctly advised Ridgely of his constitutional rights at every appropriate juncture. The trial judge found that Ridgely was advised of his rights both when he was arrested and when he was interviewed, and that the officers "assiduously respected Ridgely's rights." Even the court of appeals noted "the thorough manner in which Ridgely was apprised of his *Miranda* rights." *Id.* at 934 n. 3.

■ On two occasions Ridgely asked about the desirability or feasibility of obtaining a lawyer. On both occasions, the officers emphasized that Ridgely had an absolute right to a lawyer and that, if Ridgely wanted a lawyer, they would not question him until the lawyer arrived. Both times, Ridgely replied that he did not want a lawyer. Ridgely's express statements cannot reasonably be interpreted as attempted invocations of his *Miranda* rights.

Only once, on August 23, did Ridgely state that he wanted a lawyer. At that point, Investigator Port immediately terminated the interview.

■ Ridgely notes that the officers did not ask the father whether he understood his son's *Miranda* rights, whether he thought his son capable of understanding and waiving his rights, or whether he had a preference regarding his son's exercise of his rights. But this omission on the part of the officers does not, of itself, defeat the voluntariness of the waiver. In *Quick v. State*, 599 P.2d 712, 719 (Alaska 1979), we expressly rejected a per se rule that juveniles are incapable of waiving their *Miranda* rights without the guidance of an adult, adopting instead a totality of the circumstances rule. We reasoned that "[t]he mere fact that a person is under the age of majority does not automatically render him incapable of making a knowing and voluntary waiver." *Id.*

C. *Did Ridgely's father coerce him into confessing?*

■ The trial judge found that Mr. Ridgely, Sr. did not act as an agent of the police. This finding of historical fact is not clearly erroneous and must stand. The

father initially declined to be present when the police questioned his son, and changed his mind only at his son's request. In addition, the father averred that he believed he was acting in his son's interest.

The trial judge also found that Ridgely was not pressured into confessing by his father. This is an inference as to state of mind, to which this court need not defer.

Certain aspects of the father's participation in Ridgely's interrogation can only be viewed as coercive. The father urged the son to tell everything, expressed disbelief in what the son was saying, engaged in private conferences with both son and police, and relayed to the police information the son had told him in private. But on the other hand, the record suggests that Ridgely was not particularly influenced by his father. According to Officer Feichtinger, sometimes Ridgely changed his answers in response to his father's remarks, but sometimes he did not. Ridgely resisted confessing during the entire four and half hour interview on August 22, and only confessed on August 23 when confronted with Bosch's and Plumley's statements. In addition, the relationship between father and son was apparently cool and distant.

On balance, we suspect that the effect of the father's participation in Ridgely's interview was insignificant. When viewed in light of the totality of the circumstances, we do not believe that Mr. Ridgely, Sr. coerced Ridgely's confession.

## V. FAILURE TO TAPE–RECORD BEGINNING OF INTERVIEW

Ridgely also argues that our 1985 decision in *Stephan v. State*, 711 P.2d 1156 (Alaska 1985), should be applied retroactively to require suppression of all his statements to the police at McLaughlin. In *Stephan*, we held that state due process requires law enforcement officials to tape-record custodial interrogations conducted in a place of detention, when recording is feasible. Failure to comply with the recordation requirement warrants suppression of all statements obtained during the interrogation. *Id.* at 1164. However, since

Ridgely neglected to assert failure to record as a ground for suppression in the trial court, the *Stephan* rule is unavailable to him on appeal. *Farleigh v. Anchorage*, 728 P.2d 637 (Alaska 1986).

## VI. CONCLUSION

Applying the clearly erroneous standard of review to the trial judge's findings of historical fact and drawing our own inferences from the record as to Ridgely's state of mind, we conclude that Ridgely's confession was voluntary.

We REVERSE and REMAND for further proceedings consistent with this opinion.