**Jacob B. KOCHUTIN, Jr., Appellant,**

**v.**

**STATE of Alaska, Appellee.**

**No. A–2714.**

Court of Appeals of Alaska.

June 14, 1991.

---

Linda Wilson, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Robert D. Bacon, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

## OPINION

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

PER CURIAM.

Jacob B. Kochutin, Jr., was convicted by a jury of one count of murder in the first degree and one count of sexual abuse of a minor in the first degree. Kochutin appeals, contending that the trial court erred in refusing to suppress statements that the police obtained from him as a result of custodial interrogation occurring in the absence of his counsel. Kochutin also pled no contest to a separate charge of sexual abuse of a minor in the first degree, reserving his right to appeal the trial court's refusal to suppress the testimony of the alleged victim. On appeal, Kochutin claims that testimony, which was obtained as the result of improper custodial interrogation, should have been suppressed. We reverse Kochutin's convictions for murder and the related charge of sexual abuse; we remand for further proceedings on the charge of sexual abuse to which Kochutin pled no contest.

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

## FACTS

The parties have stipulated to the relevant facts. Seven-year-old T.T. disappeared from his home on St. Paul Island sometime between June 24 and June 26, 1984. An extensive search produced no trace of T.T. Approximately thirteen months later, on July 25, 1985, T.T.'s body was discovered in a trunk in the St. Paul home of Kochutin's uncle. An autopsy revealed that T.T. had been dead for approximately a year and that he apparently died from repeated stabbings. The condition of T.T.'s clothing indicated that he had been sexually abused.

Kochutin, who resided on St. Paul Island when T.T. disappeared, was a suspect in the child's death. When T.T.'s body was found, Kochutin was imprisoned at the Palmer Correctional Center, serving a sentence for unrelated offenses. The day after T.T.'s body was discovered, prison officials noticed that Kochutin missed two meals, appeared to be agitated, and began using the inmates' pay phone more than usual. Suspecting that news of T.T.'s discovery may have triggered Kochutin's behavior and fearing a possible escape attempt, officials moved Kochutin from the minimum custody portion of the institution into a more secure administrative segregation unit. Prison officials also contacted the Alaska State Troopers in Palmer and advised them of Kochutin's behavior and his transfer to administrative segregation. Eleven days later, on August 6, 1985, Kochutin was transferred from the Palmer Correctional Center to the even more secure administrative segregation unit at the Cook Inlet Pretrial Facility in Anchorage. The transfer was again based on the fear that, as a murder suspect, Kochutin might attempt to escape.

In the meantime, Alaska State Trooper Rollie Port, who was working on T.T.'s murder investigation, became interested in interviewing Kochutin. Kochutin was one of several people whom Port regarded as a suspect. Port consulted with the Anchorage District Attorney's Office about the possibility of interrogating Kochutin, but was instructed on August 9, 1985, to refrain from any contact with Kochutin until the state had researched the legality of a jailhouse interview. Port was told that he would hear back from the district attorney's office within about two weeks.

On August 12 or 13, 1985, however, while Port awaited word from the district attorney's office, Kochutin telephoned Assistant Public Defender William F. Morse, who had been representing him on several cases since May 1, 1984, including the charges for which he was imprisoned. Kochutin asked Morse why he was transferred to the Cook Inlet Pretrial Facility.

Morse made several inquiries in response to Kochutin's request and learned that Kochutin had been transferred because he was a suspect in the recently discovered St. Paul homicide. On August 13, 1985, Morse called Port and asked him to refrain from speaking with Kochutin unless Morse was present. Port told Morse that he planned to be in Anchorage the following day and wanted to arrange an interview with Kochutin then. Morse said that he would visit Kochutin in jail and call Port back.

The next day, August 14, 1985, Morse visited Kochutin and spoke with him about Port's request for an interview. After the visit, Morse notified Port and the Anchorage District Attorney's Office by telephone that Kochutin was not interested in speaking with the authorities about the homicide investigation. On August 15, 1985, Morse wrote a letter to Port and the district attorney's office, confirming that Kochutin did not want to speak with the authorities. In the letter, Morse indicated that he would let investigators know if Kochutin changed his mind.

Approximately a week later, the state arrested another St. Paul resident, Xenofont Emanoff, on charges of sexually abusing T.T. shortly before the child's disappearance in June of 1984. The police had focused on Emanoff as another possible suspect in T.T.'s homicide. When Emanoff was arraigned in St. Paul after being arrested on August 23, the St. Paul magistrate appointed Morse to represent Emanoff, since Morse had been handling the St.

Paul calendar for the public defender agency.

When Emanoff was indicted in Anchorage several days later for the sexual abuse of T.T., the district attorney's office objected to Emanoff's representation by the public defender agency noting that Morse's representation of Kochutin in connection with the pending homicide investigation posed a potential conflict. On September 5, 1985, the superior court, after holding a hearing, granted the state's motion to disqualify the public defender agency and ordered the appointment of conflict counsel for Emanoff.

For the balance of 1985, the state made no further effort to contact Kochutin. At some point that fall, Kochutin was transferred from his placement in administrative segregation at the Cook Inlet Pretrial Facility, and by December of 1985 he was back in normal institutional placement as a sentenced prisoner at the Hiland Mountain Correctional Facility.

The investigation of T.T.'s homicide remained unresolved. By the summer of 1986, the Alaska State Troopers were anxious to wrap the case up. The list of suspects had narrowed to Kochutin, Emanoff, and two other men; all four were incarcerated in the Anchorage area. Emanoff's trial for sexually abusing T.T. was scheduled for September of 1986. The troopers and the district attorney's office both thought it desirable to charge Emanoff or eliminate him as a homicide suspect before his sexual abuse trial.

On August 13, 1986, exactly a year after first being told that Morse represented Kochutin in connection with T.T.'s homicide, Trooper Robert Stevenson and Port met with the district attorney and discussed the status of the investigation. By that time, Kochutin was incarcerated at the Sixth Avenue jail in Anchorage, still serving a sentence for unrelated offenses. The district attorney and Port both believed that Kochutin might be willing to speak with them without Morse present, but both felt that no interview would be possible if they notified Morse first. After checking Kochutin's status and learning that he had no pending or unresolved criminal charges against him, the district attorney advised the troopers to contact Kochutin in jail and attempt to interview him without first notifying Morse.

Stevenson visited Kochutin at the Sixth Avenue jail later that same day. As planned, Morse was given no notice of the interview. Stevenson advised Kochutin of his Miranda[1] rights and reminded him that he had an attorney, Morse, and could request Morse's assistance if he so wished. Kochutin, however, agreed to speak with Stevenson. In the course of the August 13 interview, Kochutin agreed to submit to a polygraph test the next day.

The next day, Stevenson transported Kochutin to trooper headquarters in Anchorage and placed him in the custody of Trooper Paul Burke, a polygraph examiner. Burke proceeded to interview Kochutin and perform a polygraph test. Although Kochutin was given information concerning the polygraph and signed a form regarding liability of the polygraph examiner, he was not readvised of his Miranda rights by Burke. During the polygraph test, Kochutin denied involvement in T.T.'s homicide. Upon completion of the test, Burke concluded that Kochutin had been deceptive; he relayed his conclusions to Port.

By the time Port learned the results of the polygraph test, Kochutin had been returned to the Sixth Avenue jail. Port had Kochutin brought back to trooper headquarters for an additional interview. When Kochutin arrived, Port confronted him with the polygraph results. Port did not readvise Kochutin of his rights, mistakenly believing that Burke had done so prior to the polygraph test. In the course of the interview with Port, Kochutin admitted "accidently" stabbing T.T. and placing his body in a trunk.

A day later, August 15, Port and Stevenson jointly interviewed Kochutin. They gave Kochutin his Miranda warnings at the outset of the interview, and Kochutin

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

again consented to an interview. Kochutin made further incriminating statements.

On August 18, Port again interviewed Kochutin, once more advising him of his rights before beginning the interrogation. In this interview, Kochutin acknowledged sexually molesting T.T. before killing him. Kochutin said he got angry at T.T. because the boy resisted; Kochutin stabbed T.T. when he tried to run away. During this interview, Kochutin also admitted sexually abusing another boy, M.T.

Port conducted a final interview with Kochutin on August 20, 1986. Prior to the interview, Port and the district attorney had become aware that Kochutin was not readvised of his *Miranda* rights before the August 14 polygraph test and follow-up interview. They prepared an augmented *Miranda* warning, hoping to remove any taint resulting from the failure to readvise Kochutin. In addition to the usual *Miranda* warning, Port advised Kochutin of the possibility that his prior incriminating statements might not be admissible in evidence against him. Port emphasized that if Kochutin agreed to a further interview, he should do so because he wanted to talk to the police and not simply because he had already made incriminating statements. Kochutin agreed to the additional interview and again described the sexual abuse and murder of T.T. as he had on August 18.

Within a week, the state charged Kochutin with the murder and sexual abuse of T.T., as well as with sexual abuse of M.T. Only after the formal charges were filed was the public defender agency informed that Kochutin had been contacted in jail and interviewed by the troopers.

The sexual abuse charge relating to M.T. was severed from the two charges dealing with T.T. As to the charges involving T.T., Kochutin moved to dismiss the indictment and to suppress the statements that he had given to the troopers. He argued that the police-initiated interviews of August 13, 14, 15, 18, and 20 were impermissible because they occurred in the absence of Morse, his counsel, and violated Kochutin's decision not to speak with the authorities about the T.T. homicide, which he communicated through Morse to both the district attorney's office and the troopers a year previously. Kochutin further argued that, even assuming the police interviews were not *per se* impermissible, the failure to give *Miranda* warnings before the polygraph test and the post-polygraph interview on August 14 mandated suppression of all the statements that he made that day and in subsequent interviews.

Superior Court Judge Victor D. Carlson denied the dismissal and suppression motions. Judge Carlson found that Morse's August, 1985, attempt to invoke Kochutin's right to remain silent and to have counsel present during interrogation was ineffective and premature because the attempted invocation was not personally made by Kochutin, and occurred before any actual custodial interrogation began. Judge Carlson further determined that it was unnecessary to readvise Kochutin of his *Miranda* rights on August 14, 1986, since he had already been advised of his rights on August 13, and had consented to an interview. Kochutin was subsequently tried before a jury and convicted of the murder and sexual abuse charges involving T.T.

Kochutin separately moved to suppress the testimony of the victim, M.T., in the sexual abuse case that had been severed from the charges relating to T.T. Advancing the same arguments he used in the case involving T.T., Kochutin alleged that his August 20 confession as to M.T. was unlawfully obtained. Kochutin argued that the police had obtained M.T.'s testimony as a direct result of that confession. He thus maintained that M.T.'s testimony was suppressible under the fruit-of-the-poisonous-tree doctrine. Judge Carlson, adopting his ruling in the T.T. case, denied Kochutin's motion to suppress. In so doing, however, Judge Carlson expressed the view that the fruit-of-the-poisonous-tree doctrine would have been applicable to M.T.'s testimony if Kochutin's August 20 confession had been unlawfully obtained. Upon receiving Judge Carlson's ruling, the parties stipulated that the suppression issue was dispositive, and Kochutin entered a plea of no contest, reserving his right to appeal.

## DISCUSSION

On appeal, Kochutin argues that Judge Carlson erred in denying his suppression motion. Kochutin's principal argument is that the August 13 through 20, 1986, interviews were impermissible under the rule of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

In *Miranda*, the United States Supreme Court found that police interrogation of persons in custody chilled the exercise of the right against self-incrimination, as guaranteed by the fifth and fourteenth amendments to the United States Constitution. To protect this right, the Court required the police to give certain warnings before questioning a person in custody. Among the rights included in the mandatory warnings is the right to consult an attorney and to have the attorney present during interrogation. Under *Miranda*, when a suspect requests an attorney during custodial interrogation, all questioning must cease until an opportunity to consult with counsel has been provided.

In *Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85, the Supreme Court expanded the *Miranda* rule. *Edwards* adopted a prophylactic rule holding that once a suspect invokes the right under *Miranda* to consult with counsel, and thereby terminates an interrogation, the police are barred from any subsequent effort to initiate further interrogation until the suspect has been given the opportunity to consult with counsel. Under the *per se* rule of *Edwards*, police-initiated reinterrogation is prohibited even when the suspect, upon being recontacted, expressly waives his *Miranda* rights.

Kochutin argues that the *Edwards* rule applies to his case. He points out that he was in custody at the Palmer Correctional Center in July of 1985, when T.T.'s body was discovered. Because he was a suspect in the murder, he was subjected to additional restraints, first in administrative segregation at Palmer, and later by being transferred to administrative segregation at the Cook Inlet Pretrial Facility. At that point, Kochutin consulted with his attorney, who made it clear to the district attorney's office and the troopers that he represented Kochutin in connection with the pending investigation and that Kochutin wished to invoke his *Miranda* rights to remain silent and to have counsel present.

Kochutin emphasizes that the state was clearly aware of and accepted the fact that Morse was representing him, since it moved to disqualify Morse and the public defender agency from representing Emanoff, another potential suspect in the murder of T.T., on grounds of conflict. Kochutin further points out that, from the time Morse invoked his right to remain silent in August of 1985, until the police initiated the first contact with him in jail a year later, on August 13, 1986, he remained in continuous custody. Kochutin asserts that, as long as he remained in continuous custody after invoking his *Miranda* rights, *Edwards* precluded the police from initiating any further contact without Morse, his attorney, being present.

■ The state acknowledges, in response, that Judge Carlson was mistaken in rejecting Kochutin's *Edwards* argument on the ground that Kochutin's attempt to assert his *Miranda* rights had been premature and was not personally made. The state concedes that Kochutin could properly assert his *Miranda* rights through counsel rather than personally and that the assertion could properly be made in anticipation of custodial interrogation instead of at the outset of an actual interview. The state's concession on this score certainly appears to be well founded. *See, e.g., Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *United States v. Wolf*, 879 F.2d 1320 (6th Cir.1989); *Cervi v. Kemp*, 855 F.2d 702, 706–07 (11th Cir. 1988).

The state nevertheless insists that *Edwards* is inapplicable to Kochutin's case. According to the state, *Edwards* requires only that a prisoner be given the opportunity to consult with counsel; once a person is afforded the opportunity to consult with an attorney, the *Edwards* prohibition ceases

to apply, and the police may again initiate contact.

■ Whatever force this argument might once have had, it is now clearly untenable. After the state filed its brief in the present case, the United States Supreme Court issued its decision in *Minnick v. Mississippi*, — U.S. —, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), expressly rejecting the narrow reading of *Edwards* that the state here proposes. In *Minnick*, the Court held that the right to counsel under *Miranda* and *Edwards* includes not only an opportunity to consult with an attorney, but also the opportunity to have the attorney present during any custodial interrogation. Thus, according to the Court in *Minnick*, once a suspect invokes the right under *Miranda* to consult with counsel, the police are flatly precluded from initiating any further contact unless the person's attorney is present.

■ The state further argues, however, that even if *Edwards* is not narrowly read, it remains inapplicable to Kochutin's case. According to the state, *Edwards* applies only to suspects who remain in continuous custody after making an initial request to consult with counsel. *See, e.g., United States ex rel. Espinoza v. Fairman*, 813 F.2d 117, 122, 124–27 (7th Cir.1987). The state points out that in Kochutin's case, the challenged interviews occurred a full year after Morse had asserted Kochutin's right to remain silent; although Kochutin was technically still in custody, he was apparently confined as a sentenced prisoner serving a term for unrelated offenses. Kochutin was not in detention for T.T.'s homicide, and the district attorney took the precaution of ascertaining that he had no other cases pending. The state contends that Kochutin's status as a sentenced prisoner and the amount of time that elapsed after he invoked his right to remain silent removed his case from the *Edwards* rule.

Although the dissent in this case finds the state's argument persuasive, we do not.

The United States Supreme Court made it clear in *Minnick* that *Edwards* adopted a "bright-line" rule that can be easily understood and predictably applied. 111 S.Ct. at 90–92. Exceptions to the *Edwards* rule should not be carved out lightly. The exception to *Edwards* that the state proposes in this case is simply an argument that *Edwards* ought not to apply to Kochutin's situation, even though Kochutin undeniably invoked his *Miranda* rights and was thereafter subjected to police-initiated custodial reinterrogation without counsel present. This type of fact-specific analysis is precisely the type of uncertain case-by-case adjudication that the bright-line rule in *Edwards* is meant to avoid.

Moreover, the state's proposed *Edwards* exception presupposes that the *Edwards* rule applies only to suspects who remain in continuous custody after invoking their *Miranda* rights. The "continuous custody" requirement that the state relies on appears to have first been articulated by the court in *Fairman*, 813 F.2d at 124–27. Although, as the dissent in this case notes, this requirement seems to have been generally accepted by federal appellate courts, it has never been definitively ruled on by the United States Supreme Court, and was not expressly adopted in *Edwards*.

In any event, Kochutin actually did remain in continuous custody between August of 1985, when he first invoked his *Miranda* rights, and August of 1986, when Stevenson contacted him at the Sixth Avenue jail without notifying Morse. Not only did Kochutin remain continuously in custody, but the subject of the police-initiated questioning in Morse's absence was precisely that to which Kochutin originally invoked his *Miranda* rights.

We find nothing in *Edwards* or in subsequent decisions of the Supreme Court to indicate that *Edwards* should be relaxed by the mere passage of time. Nor are we persuaded that Kochutin's status as a sentenced prisoner removes his case from coverage of the *Edwards* rule.[2] The fact that

---

2. The dissent appears to rely on *Illinois v. Perkins*, — U.S. —, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), to support its argument that a sentenced prisoner, with no charges pending, classified to a standard custodial arrangement, is "at home" in prison, and therefore not subject to

Kochutin was not being detained in connection with T.T.'s homicide seems immaterial, since the United States Supreme Court has made it clear that *Edwards* applies even when police seek to question a suspect about charges other than those for which the suspect was arrested and as to which the suspect first invoked the right to remain silent. *See Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

■ As evidenced by the fact that the troopers deemed it necessary to advise Kochutin of his *Miranda* rights, the interviews that occurred at the Sixth Avenue jail and at trooper headquarters in August of 1986 plainly amounted to custodial interrogation. Under the circumstances, it appears that the *Edwards* rule was applicable. Under *Edwards*, the police-initiated interviews were impermissible because they occurred without notice to Morse and without Morse's presence. As a result, Kochutin's apparent willingness to waive his *Miranda* rights is inconsequential.

■ Even if *Edwards* were not strictly applicable in this case, we would be inclined to find that, under the totality of the circumstances, Kochutin's *Miranda* waivers were not voluntary. The state bears the burden of proving the validity of a *Miranda* waiver and the voluntariness of a confession by a preponderance of the evidence. *State v. Ridgely*, 732 P.2d 550, 554–55 (Alaska 1987); *Giacomazzi v. State*, 633 P.2d 218, 222 n. 4 (Alaska 1981). While this court is bound by the trial court's findings of historical fact, we decide the ultimate issue of voluntariness independently, without deference to the trial court's conclusion. The decision is one that must be based on the totality of circumstances in each case. *Ridgely*, 732 P.2d at 555–56.

■ In the present case, we accept the trial court's findings of historical fact, which were largely the product of a stipulation between the parties. It is undisputed that Kochutin affirmatively sought out Morse's assistance after being placed in administrative segregation as a suspect in T.T.'s homicide. Having consulted with Morse, Kochutin decided that he did not desire to be questioned by the authorities; he communicated his wishes through Morse and clearly indicated that Morse would notify the authorities if he changed his mind. Thereafter, the troopers, in concert with the Anchorage District Attorney, specifically decided to bypass Morse and obtain an interview with Kochutin alone, in jail. They did so knowing full-well that on prior occasions when Kochutin had been interviewed by the police in the absence of counsel he had waived his *Miranda* rights and confessed to unrelated crimes. It is clear from the record that the district attorney and the troopers believed it likely that they would be able to obtain a statement from Kochutin if they could interview him without his attorney present, and unlikely if they could not.

In deciding *Miranda*, the United States Supreme Court emphasized that giving the required *Miranda* warnings would not in itself assure the voluntariness of any subsequent interrogation. The Court cautioned:

> If the interrogation continues without the presence of an attorney and a state-

---

the coercive atmosphere attendant the tradition custodial interrogation concerns expressed in *Miranda*.

We read *Perkins* to hold that an undercover agent planted in a prison cell, who elicits incriminating statements from the accused, has not obtained a coerced confession. This is so not because of the accused's "continuous custodial position", but because the accused is unaware of that his cellmate is a government agent who could exert control over his fate. The court found, "Respondent had no reason to feel that [the] undercover agent ... had any legal authority to force him to answer questions

or that [the undercover agent] could affect respondent's future treatment." *Id.* 110 S.Ct. at 2398.

In the present case, Kochutin was questioned in the prison and in locations outside the prison by persons he knew to be law enforcement officials who could affect his future treatment. After all, Kochutin had previously been moved to administrative segregation and heightened security locations as a result of the mere fact that he was the focus of suspicion in a murder investigation. Under these facts, the continuous nature of his incarceration does not lessen the coercive quotient of interrogation.

ment is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. This Court has always set high standards for proof for the waiver of constitutional rights, and we reassert those standards as applied to in-custody interrogation. Since the state is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that the confession was in fact eventually obtained.

384 U.S. at 475, 86 S.Ct. at 1628 (citations omitted). In the present case, considering the totality of the circumstances, we find that the state has failed to meet its heavy burden of showing a voluntary *Miranda* waiver.

We do not hold that a person who requests counsel during a custodial interrogation may never afterward voluntarily waive his *Miranda* rights in the absence of counsel. We do hold, however, that on the particular facts of this case, Kochutin's *Miranda* rights were violated. Here, as we have noted, Kochutin clearly communicated to the authorities his personal belief that he could not adequately protect his rights unless counsel was present with him during the interrogation pertaining to the T.T. homicide. The state affirmatively acknowledged Morse's role in representing Kochutin. In the face of Kochutin's clear communication, and while Kochutin remained incarcerated, the authorities nevertheless sought to interview him in Morse's absence, in jail, on the precise issue as to which Kochutin had initially invoked his *Miranda* rights. When they reinitiated

contact with Kochutin, the troopers had no information indicating that Kochutin was desirous of contacting them or that he had any reason to change his mind with respect to his previously expressed decision to decline a police interview.

We are particularly troubled that Kochutin's interrogation took place at the direction of the Anchorage District Attorney, despite his awareness that Kochutin had been represented by Morse in connection with the investigation of T.T.'s death. Judge Carlson found that, under the circumstances, the prosecutor violated the Alaska Code of Professional Responsibility, Disciplinary Rule 7–104(A)(1), which provides, in relevant part:

(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

Judge Carlson declined to suppress Kochutin's confession on this basis alone, finding that suppression was not an appropriate remedy for violation of the disciplinary rule.

Although we are inclined to agree that a violation of this disciplinary rule will not necessarily trigger the sanction of suppression, we consider the violation in this case significant because of its relevance on the issue of voluntariness. In our view, the willingness of the district attorney to violate the disciplinary rule by knowingly bypassing Kochutin's counsel underscores the authorities' awareness that Kochutin would have been unlikely to waive his *Miranda* rights if given the opportunity to speak with Morse. This in turn provides a strong indication that the troopers and the district attorney believed that, to obtain a statement from Kochutin, they would have to interrogate him in a setting in which it was unlikely that he would be able to make an informed and intelligent decision as to his own best interests. If this is true, then it is difficult to see how Kochutin can real-

istically be said to have knowingly, intelligently, and voluntarily waived his fifth amendment rights.

Under these peculiar circumstances, we decline to find that Kochutin's unexplained willingness to waive the presence of counsel was voluntary. Accordingly, we conclude that the superior court erred in denying the motion to suppress Kochutin's statements. To reiterate, our holding is based on two alternative grounds. First, we conclude that the police-initiated interrogations of Kochutin were impermissible under the rule of *Edwards*. Second, even if *Edwards* is inapplicable, we find, under the totality of the circumstances, that Kochutin did not knowingly, intelligently, and voluntarily waive his *Miranda* rights.

Although our decision necessitates reversal of Kochutin's conviction for the murder and sexual abuse of T.T., we must separately consider his conviction for the sexual abuse of M.T. The specific issue presented is whether M.T.'s proposed testimony against Kochutin is subject to suppression as a fruit of Kochutin's improper interrogation.

Kochutin admitted sexually abusing M.T. during his interview with Port on August 18, 1986. Prior to that time, the troopers had apparently interviewed M.T. in connection with T.T.'s disappearance and had asked if M.T. was ever sexually abused by Kochutin. M.T. had evidently denied any sexual abuse. After Kochutin told Port that he had sexually abused M.T., Port traveled to St. Paul Island for an additional interview with M.T. M.T. initially denied

sexual contact with Kochutin, but after Port told him that Kochutin had confessed, M.T. confirmed that sexual contact had occurred.

In moving for suppression below, Kochutin claimed that M.T.'s testimony resulted directly from his improperly obtained confessions and was therefore suppressible under the fruit-of-the-poisonous-tree doctrine. Judge Carlson denied Kochutin's motion based on the conclusion that the authorities did not act improperly in obtaining Kochutin's confession. The judge went on to find, hypothetically, that M.T.'s testimony would have been subject to the fruit-of-the-poisonous-tree doctrine had Kochutin's confession been illegally obtained.

On appeal, Kochutin again claims that M.T.'s testimony must be suppressed as the fruit of the improper interrogations. However, Kochutin advances this claim in a single, conclusory paragraph that cites no supporting authority whatsoever. In response, the state has presented a forceful argument, supported by substantial authority, casting serious doubt on the question of whether M.T.'s testimony should be subject to suppression.[3] Kochutin has not addressed the state's arguments in his reply brief.

Given Kochutin's failure to cite or discuss any authority for his claim that M.T.'s testimony should be suppressed, and his failure to respond to the contrary argument and authorities relied on by the state, we find that this issue has not been adequately briefed. Moreover, it appears that, because this issue was presented to the

---

**3.** In particular, it appears from the authority cited by the state that the fruit-of-the-poisonous-tree doctrine has never been as firmly rooted in the quasi-constitutional sands of *Miranda* violations as it is in the firm constitutional ground of fourth amendment infractions. *See* 1 W. La-Fave & J. Israel, *Criminal Procedure* § 9.5 at 762–73 (1984). Even in the area of fourth amendment violations, substantial questions arise as to the propriety of applying the fruit-of-the-poisonous-tree doctrine to the testimony of a witness whose identity is discovered as a result of an unlawful search or seizure. *See United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). In the area of the fifth amendment, there appears to be even greater reason to question whether suppression of a

witness would be appropriate absent exceptional circumstances. *See Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). *See also* LaFave & Israel, *supra*, § 9.5 at 172–73 (Supp.1990). In the present case, Judge Carlson relied on the dissenting view in *Ceccolini* for the conclusion that M.T.'s testimony would have been subject to suppression if Kochutin's confessions had been unlawfully obtained. Judge Carlson's conclusion seems problematic not only in that it is hypothetical, but also because it relies on a dissenting view in a Supreme Court case that deals with a fourth amendment violation rather than a *Miranda/Edwards* violation.

trial court without an evidentiary hearing, on stipulated facts, the factual record currently before this court does not permit a meaningful decision as to whether M.T.'s testimony should be suppressed.

From our review of case law in the area, it appears that proper resolution of this issue may hinge on particular circumstances, such as: the role played by Kochutin's statements in inducing M.T.'s cooperation; the length of time between Kochutin's statements and the discovery of M.T.'s testimony; the extent to which M.T. was known to the police as a potential victim of sexual abuse prior to Kochutin's statements; the degree of free will exercised by M.T. in agreeing to testify; and, the time, place, and manner of any questioning of M.T. by the troopers. *See, e.g., People v. Briggs,* 709 P.2d 911, 918 (Colo.1985); *State v. Childress,* 35 Wash.App. 314, 666 P.2d 941, 943 (1983).

The conclusory attention given by Kochutin to this issue in his briefs may be the result of the peculiar procedural manner in which this issue was presented to the superior court. Kochutin's motion to suppress M.T.'s testimony seems to have been made in anticipation of a plea of no contest under *Oveson v. Anchorage,* 574 P.2d 801 (Alaska 1978), and *Cooksey v. State,* 524 P.2d 1251 (Alaska 1974). Judge Carlson had evidently already ruled against Kochutin on the primary question of whether the police had violated Kochutin's *Miranda* rights by interrogating him in the absence of counsel. Judge Carlson appears to have been asked to consider the fruit-of-the-poisonous-tree issue only as a secondary, hypothetical matter.

The state, in its brief, suggests that one appropriate remedy on this issue might be to remand to the superior court for additional fact finding. Under the circumstances, we agree that the issue must be remanded for reconsideration by the superior court after a full evidentiary hearing concerning the circumstances surrounding M.T.'s complaint and after more complete briefing on the issue by the parties.

REVERSED in part and REMANDED in part.[4]

MANNHEIMER, J., not participating.

BRYNER, Chief Judge, dissenting.

I am unable to agree with the court's conclusion that the state violated the rule of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), or with its alternative conclusion that Kochutin's *Miranda* waivers were involuntary. Although this case presents unique factual circumstances that raise close and serious legal issues, I believe adherence to established precedent requires the conclusion that Kochutin's confessions were lawfully obtained.

Kochutin's reliance on *Edwards* is predicated on the assumption that he was in continuous *Miranda* custody at all pertinent times. Although the majority correctly points out that the United States Supreme Court has never definitively held that continuous custody is a prerequisite to application of the *Edwards* rule, the continuous custody requirement seems to have become uniformly accepted, and Kochutin does not seriously question it. Numerous cases hold that *Edwards* applies only so long as a suspect remains in custody after initially asserting his *Miranda* rights and that a suspect who has been released from continuous custody may subsequently be recontacted by the police; if the renewed contact occurs in a custodial setting, a renewed *Miranda* warning is, of course, required before interrogation may proceed, but the police-initiated contact will not itself be barred under *Edwards.*[1]

---

**4.** Our reversal of the convictions involving T.T. makes it unnecessary to address Kochutin's remaining claims.

**1.** *See, e.g., Dunkins v. Thigpin,* 854 F.2d 394, 397 (11th Cir.1988); *McFadden v. Garraghty,* 820 F.2d 654, 660–61 (4th Cir.1987); *United States ex rel. Espinoza v. Fairman,* 813 F.2d 117, 125–26 (7th Cir.1987); *United States v. Skinner,* 667

F.2d 1306, 1308–09 (9th Cir.1982); *People v. Trujillo,* 773 P.2d 1086, 1091–92 (Colo.1989); *State v. Byrnes,* 258 Ga. 813, 375 S.E.2d 41, 41–42 (1989); *State v. Norris,* 244 Kan. 326, 768 P.2d 296, 301 (1989); *Brown v. State,* 661 P.2d 1024, 1029–30 (Wyo.1983); *State v. Kyger,* 787 S.W.2d 13, 24–25 (Tenn.Crim.App.1989). *See*

Kochutin was confined in prison at all times from the invocation of his *Miranda* rights by Morse in August of 1985 until the interviews initiated by Trooper Stevenson's visit to the Sixth Avenue Jail a year later, on August 13, 1986. However, the mere fact that Kochutin remained in prison does not necessarily establish that he was continuously in custody for *Miranda* purposes. There is a wealth of authority to support the conclusion that a sentenced prisoner serving time in a correctional facility is not *ipso facto* in *Miranda* custody.[2]

These authorities make sense. *Miranda*'s requirement of warnings and its establishment of a right to counsel as an adjunct to the fifth amendment's guarantee against compulsory self-incrimination were predicated on the inherently coercive nature of confinement in police custody following an arrest. Most recently, the Supreme Court has described its concern with the inherent coerciveness of police custody in the following terms: "Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will...." *Illinois v. Perkins*, — U.S. —, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990).

In recognition of *Miranda*'s underlying purposes, however, the Supreme Court has made it plain that *Miranda* ceases to apply when custody occurs in the absence of inherent coercion. As the Court concluded in *Perkins:* "We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent." *Id.*

When a person is confined in custody solely as a sentenced prisoner, with no charges pending, the issue of guilt resolved by a final verdict, and the terms and conditions of future confinement clearly defined in a written judgment that is a matter of public record, the anxiety and uncertainty that support *Miranda*'s finding of inherent coercion simply cease to exist. When custody is not related to any pending or unresolved matter, it seems to me that there is little cause for concern that a police officer will "appear to control the suspect's fate," *Id.*, at least in the absence of a showing that the officer's conduct somehow creates an atmosphere of custody going beyond that to which the suspect is accustomed in his normal setting.[3] *See, e.g., Skinner*, 667 F.2d at 1308–09.

If it is safe to say under existing case law that a sentenced prisoner cannot automatically be deemed to be in continuing *Miranda* custody, then it is equally safe to say that a sentenced prisoner who invokes the right to counsel upon being interrogated under circumstances amounting to *Miranda* custody and is thereafter returned to normal sentenced-prisoner status should not automatically be deemed to be in continuous custody under *Edwards*. Once returned to the ordinary routine of other sentenced prisoners—without any vestige of the inherently coercive circumstances incidental to custodial interrogation—the prisoner should be treated, for *Edwards*

---

*also United States v. Granda,* 29 M.J. 771, 776 (ACMR 1989).

2. *See, e.g., United States v. Hall,* 905 F.2d 959, 961–63 (6th Cir.1990); *United States v. Willoughby,* 860 F.2d 15, 23 (2nd Cir.1988); *United States v. Cooper,* 800 F.2d 412, 414–15 (4th Cir.1986); *United States v. Conley,* 779 F.2d 970, 972–73 (4th Cir.1985); *Cervantes v. Walker,* 589 F.2d 424, 428–29 (9th Cir.1978); *State v. Vickers,* 159 Ariz. 532, 768 P.2d 1177, 1183 (1989); *State v. Fulminante,* 161 Ariz. 237, 778 P.2d 602, 608 (1988); *People v. Johnson,* 197 Ill.App.3d 762, 144 Ill.Dec. 293, 555 N.E.2d 412, 413–14 (1990); *Blain v. Commonwealth,* 7 Va.App. 10, 371 S.E.2d 838, 840–41 (1988); *People v. Anthony,* 185 Cal.App.3d 1114, 230 Cal.Rptr. 268, 272 (2 Dist.1986).

3. In considering circumstances analogous to those in Kochutin's case, the United States Court of Appeals for the Sixth Circuit aptly observed in *United States v. Hall,* 905 F.2d at 962:

Hall remained in jail, but he was there because he was already serving a prior sentence. Hall was no stranger to the state penitentiary. In fact, Hall was not "in custody" as that term has been used in the context of *Edwards* and *Roberson* [*Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988)]. One could readily argue that Hall was more comfortable within the surroundings in which he was interrogated than the two Secret Service agents.

purposes, in the same manner as any person who has been arrested, questioned in custody, and released.

Kochutin was serving a sentence for unrelated crimes when T.T.'s body was discovered. As an obvious focus of suspicion, he was twice transferred to more secure and restrictive confinement. Kochutin's changed status could well give rise to the type of anxiety and uncertainty contemplated by *Miranda,* and consequently, any attempt to question Kochutin while he was in administrative segregation would have amounted to custodial interrogation. For this reason, when Kochutin consulted with his attorney and invoked his *Miranda* rights through him, Kochutin was certainly in *Miranda* custody.

From the limited record in the case, it is uncertain precisely when Kochutin's *Miranda* custody ended. It is nonetheless clear that at some point during the fall of 1985—by December at the latest—Kochutin was released from administrative segregation and returned to regular, sentenced-prisoner status at the Hiland Mountain Correctional Center. From that point, so long as Kochutin remained incarcerated solely as a finally convicted, sentenced prisoner, he was no longer in *Miranda* custody. In the absence of evidence suggesting that Kochutin's return to sentenced-prisoner status was a ruse to allow further police contact, *Edwards* no longer precluded po-

lice-initiated contact in the absence of counsel.

Admittedly, *Edwards* was meant to adopt a "bright-line" rule that could be applied consistently and predictably; the case could thus conceivably apply to Kochutin's situation, even though neither logic nor common sense seem to compel that result. In my view, however, *Edwards'* bright line is not a laser, burning inexorably through form and substance into infinity. When the factual circumstances of a case fall into a predictable, potentially recurring pattern to which the underlying policy of *Miranda* and *Edwards* cease to apply, then so too does the bright-line of *Edwards* cease to shine.[4]

Because Kochutin was no longer in *Miranda* custody and *Edwards* no longer applied to his case after his return to ordinary sentenced-prisoner status, the restrictions against further police-initiated contact in his case were no greater than they would have been with any other individual who had been arrested, questioned, and released after invoking his *Miranda* right to counsel. When the troopers contacted Kochutin in August of 1986, no charges were pending against him. He was not confined in connection with any contemplated or unresolved case. He was not the subject of any adversarial proceeding. The mere fact that Kochutin was the focus of a criminal investigation did not confer upon him a continuing right to counsel under the

---

4. To reach a contrary conclusion would, I think, have anomalous consequences. Kochutin's case provides a good illustration. Well before T.T.'s body was discovered, and well before Kochutin spoke with his attorney Morse about being transferred to administrative segregation, he had been convicted and sentenced on other charges. Morse represented Kochutin in connection with those charges. Kochutin has apparently remained continuously in custody as a sentenced prisoner since then. Under existing case law, in the absence of evidence indicating that Kochutin's original request for representation was for limited, sixth amendment purposes, his representation by Morse in the earlier proceedings would be presumed an invocation of his *Miranda* right to counsel as well as his right to counsel under the sixth amendment. *See, e.g., United States v. Wolf,* 879 F.2d 1320 (6th Cir.1989); *Cervi v. Kemp,* 855 F.2d 702, 706–07 (11th Cir.1988); *United States ex rel. Espinoza v. Fairman,* 813 F.2d at 117. Under *Arizona v.*

*Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), Kochutin's invocation of his fifth amendment rights in the earlier, unrelated proceedings would apply to custodial interrogation concerning any other potential charges. If *Edwards* were construed to apply automatically to those who remain continuously in custody solely as sentenced prisoners, the inevitable conclusion would seem to be that, from the time of Kochutin's original incarceration in connection with the unrelated cases, the police were barred from making any effort to contact him. Thus, even without Kochutin's call to Morse and Morse's communications in August 1985, the troopers would have violated *Edwards* if they had made any attempt to contact Kochutin without first notifying Morse and securing Morse's presence. However, as was noted in *United States v. Hall,* 905 F.2d at 963, "neither *Edwards* nor *Roberson* can be interpreted ... to grant ... such a blanket protection continuing *ad infinitum.*"

sixth amendment or art. I, § 11 of the Alaska Constitution. *Eben v. State,* 599 P.2d 700, 706–07 (Alaska 1979); *Thiel v. State,* 762 P.2d 478, 481–82 (Alaska App. 1988). By the same token, unless and until the troopers attempted to reinterview Kochutin in a setting that was more custodial than Kochutin's everyday surroundings, he had no ongoing *Miranda* right to counsel.

Thus, on the factual record of this case, I am unable to see how the authorities acted impermissibly in initiating contact with Kochutin in August of 1986 without first informing his attorney. Assuming Trooper Stevenson's visit to Kochutin at the Sixth Avenue Jail brought with it some objective manifestation of custody, the ensuing interview would have amounted to custodial interrogation requiring the *Miranda* warnings to be given. Stevenson, however, administered the requisite warnings and secured a full waiver from Kochutin. In fact, Stevenson went beyond the required warnings, reminding Kochutin that he had been represented by Morse and all but inviting him to contact Morse. Kochutin declined. *Edwards* did not bar the visit.

The majority's opinion alternatively holds that Kochutin's *Miranda* waiver was not voluntary. At first blush, this alternative theory seems plausible—even tempting. Yet Kochutin has never—not on appeal or in the superior court—challenged the voluntariness of his *Miranda* waiver or of the confessions he made during ensuing interrogations. The record—restricted as it is to stipulated facts and transcripts of Kochutin's recorded statements—is devoid of any objective indication that Kochutin did not act voluntarily. Under the circumstances, the majority's alternative theory appears less a *de facto* finding of involuntariness and more a *de jure* extension of the *Edwards* rule: that is, a finding, as a matter of law, that regardless of how voluntary Kochutin's waiver may have been, the majority, for reasons of extrinsic policy, is unwilling to recognize it as voluntary.[5] As I have previously indicated, I simply see no reason to extend the rule in *Edwards* to Kochutin's situation.

I therefore dissent.[6]

---

**5.** Kochutin separately argues that the district attorney's decision to authorize police contact without first notifying Morse violated the Alaska Code of Professional Responsibility, Disciplinary Rule 7–104(A)(1). It seems to me that this argument incorrectly assumes the existence of an ongoing attorney-client relationship between Morse and Kochutin. Arguably, when Kochutin's *Miranda* custody terminated upon his transfer back to ordinary sentenced prisoner status, Morse's representation of him in connection with his invocation of his *Miranda* rights also ended. Even assuming Morse continued to represent Kochutin, his representation would be analogous to that of a private attorney retained to provide advice to a client in anticipation of possible criminal charges, before attachment of the constitutional right to counsel and before *Miranda* custody arose. Even in the face of actual knowledge of representation, the police would not violate the constitution in contacting a person who had retained counsel under such circumstances. *Thiel v. State,* 762 P.2d at 481–82 (Alaska App.1988). It is nonetheless conceivable that Kochutin's status as a potential target would qualify him as a "party" under such circumstances for purposes of Disciplinary Rule 7–104(A)(1). If so, I agree with Judge Carlson's

conclusion that suppression would not be an appropriate remedy for violation of the Disciplinary Rule. I emphasize, however, that my conclusion is limited to these particular circumstances, in which the disciplinary rule violation occurs before the constitutional right to counsel has attached, when no *Miranda* custody exists, and when there is no "active incursion into or impairment of the attorney-client relationship...." *Id.* 762 P.2d at 483.

**6.** The majority's decision to reverse Kochutin's conviction makes it unnecessary for me to address Kochutin's remaining claims on appeal except in a cursory manner. To the extent that Kochutin advances separate federal constitutional, state constitutional, and statutory arguments for the proposition that the troopers violated his rights by initiating contact with him without first informing his attorney, I find no relevant distinctions under the three alternative theories. Kochutin has separately argued that his confessions should have been suppressed because the troopers failed to readminister the *Miranda* warnings to him on August 14, 1986. Assuming the interview on August 14 was custodial (an assumption which, in my view, cannot be confirmed on the sparse factual record now

before us), I would uphold Judge Carlson's conclusion that the failure to readminister *Miranda* warnings was not fatal. While in many circumstances, readministration of warnings might be necessary for renewed interrogation by a new officer a day after an initial waiver had been obtained, in the present case it seems to me that, in submitting to police interviews on August 14, Kochutin was doing precisely what he had agreed to do after being advised of and waiving his rights the previous day. Under these circumstances, readvisement was not necessary.

Kochutin's remaining issues are evidentiary matters relating to his trial. I would hold that the trial court did not abuse its discretion in declining to allow evidence of Xenofont Emanoff's out-of-court confessions. Alaska Rule of Evidence 804(b)(3) requires not just corroboration, but "corroborating circumstances [that] *clearly indicate* the trustworthiness of the statement." (Emphasis added.) The trial court's discretion to exclude marginally corroborated evidence under this rule is broad. *Garroutte v. State*, 683 P.2d 262, 267 (Alaska App.1984). No abuse of discretion occurred here. Given my conclusion that Emanoff's out-of-court confessions were properly excluded, I would further find that the trial court did not err in declining to allow Emanoff to be present in the courtroom during Kochutin's trial. Finally, I would find no abuse of discretion in the trial court's decision to exclude evidence of Emanoff's prior convictions from being presented to establish his possible motive for killing T.T. *See, e.g., Marrone v. State*, 359 P.2d 969, 984–85 (Alaska 1961); *People v. Hall*, 41 Cal.3d 826, 226 Cal. Rptr. 112, 718 P.2d 99, 104 (1986).